Ronald P. Oines (State Bar No. 145016)
roines@rutan.com
Talya Goldfinger (State Bar No. 294926)
tgoldfinger@rutan.com
RUTAN & TUCKER, LLP
118575 Jamboree Road, 9th Floor
Irvine, California 92612
Telephone: 714-641-5100
Facsimile: 714-546-9035

Attorneys for Plaintiffs PIPE RESTORATION
TECHNOLOGIES, LLC and ACE DURAFLO
SYSTEMS, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PIPE RESTORATION TECHNOLOGIES, LLC, a Nevada Limited Liability Company; ACE DURAFLO SYSTEMS, LLC. a Nevada Limited Liability Company, <br><br> Plaintiffs, <br><br> vs. <br><br> FLORIDA DRAIN-LINING SOLUTIONS, LLC, a Florida Limited Liability Company; RONALD CODDINGTON, an individual; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. 8:23-cv-00237-FWS-DFM <br><br> **DECLARATION OF RONALD P. OINES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR TRANSFER VENUE** <br><br> Date: April 20, 2023 <br> Time: 10:00 a.m. <br> Courtroom: 10D <br> Hon. Fred W. Slaughter |

1    I, Ronald P. Oines, declare as follows:

2         1.     I am a member of the State Bar of California, and admitted to practice

3    before this Court.  I am a partner with Rutan & Tucker, counsel of record for

4    Plaintiffs Pipe Restoration Technologies, LLC and ACE Duraflo Systems, LLC in

5    the above-captioned action.  I make this declaration in support of Plaintiffs'

6    Opposition to Defendants' Motion to Dismiss or Transfer Venue.  I have personal

7    knowledge of the matters set forth herein, and if called upon to do so, I could and

8    would competently testify thereto.

9         2.     Attached hereto as Exhibit A is a true and correct copy of the License

10   Agreement dated April 1, 2004 between ACE and Video Inspections, Inc. This is the

11   operative Agreement that has been assigned to Florida Pipe-Lining Solutions, LLC,

12   as acknowledged by Mr. Coddington in his Declaration. (ECF no. 16-1, ¶¶ 7-11.)

13        3.     Attached hereto as Exhibit B is a true and correct copy of the

14   Addendum to License Agreement dated August 24, 2016 between ACE and Florida

15   Pipe-Lining Solutions, LLC.

16        4.     Attached hereto as Exhibit C is a true and correct copy of a printout

17   created at my direction from the Florida Department of State's Division of

18   Corporation website for Florida Pipe-Lining Solutions, LLC.  This document is

19   appropriate for judicial notice because the information is available in the public

20   domain and is capable of accurate and ready determination by resort to sources

21   whose accuracy cannot reasonably be questioned.  *See* Fed. R. Evid. 201(b); *Ct.*

22   *Concepts, Inc. v. Scottsdale Indem. Co.*, No. 18-CV-421-GPC-BGS, 2018 WL

23   3570330, at *2 (S.D. Cal. July 25, 2018) (taking judicial notice of computer print-

24   out from the California Department of Insurance website).

25        5.     Attached hereto as Exhibit D is a true and correct copy of a printout

26   created at my direction from the Florida Department of State's Division of

27   Corporation website for Florida Drain-Lining Solutions, LLC.  This document is

28   appropriate for judicial notice because the information is available in the public

1  domain and is capable of accurate and ready determination by resort to sources
2  whose accuracy cannot reasonably be questioned.  *See id.*

3        6.      Attached hereto as Exhibit E is a true and correct copy of an email
4  exchange between myself and Cecelia Liu.

5        7.      I met and conferred with Ms. Liu by telephone on Monday, March 30
6  at 1:30 pm.

7        I declare under penalty of perjury under the laws of the United States that
8  foregoing is true and correct.

9        Executed this 30th day of March, 2023, at Irvine, California.

10

11

12                                              _____
                                                Ronald P. Oines

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

**ACE DURAFLO SYSTEMS, LLC**

**LICENSE AGREEMENT**

**EXHIBIT A**

**ACE DURAFLO® SYSTEMS, LLC**
**LICENSE AGREEMENT**

**This License Agreement** ("Agreement") is made and entered into as of _AUGUST 31, 2004_ (the "Signing Date"), by and between ACE DURAFLO SYSTEMS, LLC, a Nevada limited liability company, doing business as "ACE DuraFlo®" ("Licensor"), _VIDEO INSPECTIONS, INC._ ("Licensee"), and each person owning 25% or more of Franchisee who will be a party to this Agreement (in such context, "Principal") with reference to the following facts:

As a result of its expenditure of time, skill, effort and investments, Licensor has acquired the rights to and has developed a proprietary system for the cleaning and reconditioning of pipe lines and for their coating against corrosion, together with related repair and other authorized and approved services. Licensor has developed a marketing plan for the marketing of these and other services under the trade name and service mark ACE DuraFlo® and associated logos (the Names and Marks) and desires to grant to qualified persons licenses to use its concepts, programs, and methods of marketing in the operation of a pipe repair and reconditioning business utilizing the Names and Marks selected, used, and promoted by Licensor, and the techniques authorized by Licensor.

Licensee has made application to Licensor for a license to operate a residential ACE DuraFlo® business and Licensor has approved the application in reliance upon the representations made in the application. Licensee acknowledges that it has read and understands this Agreement, and that all questions raised by Licensee with regard to this Agreement or the Licensed Business have been answered satisfactorily by Licensor, but that Licensee is not relying upon any representations of Licensor other than as set forth in this Agreement and in the Offering Circular Licensee acknowledges receiving at least ten business days before signing this Agreement. In signing this Agreement, Licensee acknowledges: (i) the importance of operating the Licensed Business in strict conformity with Licensor's standards, as modified from time to time; (ii) the Licensed Business cannot be successful is without significant marketing and other efforts of Licensee; and (iii) like any other business, there are risks inherent in operating the business and there is no guarantee, regardless of the efforts of Licensee, that the Licensed Business will be successful.

**I.**
**DEFINITIONS**

**1.01 Competitive Business.** The term "Competitive Business" shall mean any business offering, or awarding franchises or licenses to others to offer, pipe restoration services, together with or separate from related repair and other related services, or any other business that provides the same or similar services as are customarily offered through licensees or franchisees of Licensor, except under a valid license or franchise or with Licensor.

**1.02 Epoxy.** The term "Epoxy" shall mean the epoxy formulae approved by Licensor for use in the Process.

**1.03 Gross Receipts.** The term "Gross Receipts" shall mean the total amount of revenues received by Licensee from all products and services offered by Licensee for the restoration or reconditioning of piping or piping systems, product sales or upgrades related to or connected to the water pipes in a structure (including but not limited to hot water heaters, humidifiers, water softeners, and sink or tub fixtures and valves) and any other revenues generated from the application of Epoxy sold by Licensor or its designees to Licensee, or using equipment purchased or leased to operate the Licensed Business. Such amounts shall be considered Gross Receipts, whether payment is received by cash or credit, and shall include the fair market value of goods delivered and services rendered to Licensee, or its designee, in consideration for goods and services provided in, from, or in conjunction with the Licensed Business. There shall be excluded from "Gross Receipts" bona fide refunds, credits given or allowed by Licensee to customers, uncollectible checks, and amounts collected from customers and remitted by Licensee to any governmental taxing authority in satisfaction of sales taxes. If one ACE DuraFlo® licensee (the "general contractor licensee") subcontracts work to another licensee (the "subcontracting licensee"), revenues from that project shall be included in the Gross Receipts of the general contractor licensee, and not the subcontracting licensee.

**1.04 License.** The term "License" shall mean the right granted to Licensee by Licensor to use the System of Operation and to use the Names and Marks selected, used, and promoted by Licensor.

**1.05 Licensed Business.** The term "Licensed Business" shall mean the business licensed under this Agreement to operate utilizing the System of Operation and the Names and Marks in reconditioning plumbing systems of all types, with the exception of fire sprinkler systems.

**1.06 Names and Marks.** The term "Names and Marks" shall mean the commercial trade names, trademarks, service marks and other commercial symbols, including associated logos, and patents (if any), now or hereafter selected, used or promoted by Licensor in connection with the process and system of operation.

**1.07 Operating Territory.** The term "Operating Territory" shall mean the non-exclusive geographic area described in Exhibit 1 to this Agreement.

**1.08 Process.** The term "Process" shall mean the technology used and licensed by Licensor for the repair and restoration of pipes used for distributing potable water, gas, heating and air conditioning systems, selected wastewater pipelines, in-ground heating systems, fire suppression systems, and industrial applications.

**1.09 System of Operation.** The term "System of Operation" shall mean the business plans and methods licensed by Licensor to be used in connection with the operation of the Licensed Business. The "System of Operation" includes standards, specifications, methods, patents, procedures, techniques, management systems, software, identification schemes and information, all of which may be changed, improved and further developed from time to time by Licensor.

II.
### GRANT OF LICENSE AND RENEWAL OF LICENSE

**2.01 Grant of Franchise.** Subject to the provisions of this Agreement, Licensor grants to Licensee a License for an initial term of ten years, commencing on the date of this Agreement, to utilize the System of Operation and to use the Names and Marks of Licensor in the conduct of a business utilizing the Process in reconditioning plumbing systems of all types, with the exception of fire sprinkler systems within the Operating Territory.

**2.02 Reserved Rights.** Licensee agrees that it may not use any of the Names and Marks, the Process, the Epoxy or the System of Operation outside the Operating Territory. Notwithstanding the foregoing, if Licensee wishes to use any part of the Names and Marks, the Process, the Epoxy or the System of Operation outside the Operating Territory for a particular pipe restoration project, it may seek written permission from Licensor to do so on a job-by-job basis. Licensor shall have the sole right to determine whether or not to grant such approval, and impose any reasonable conditions upon its approval. Any approval given to one request shall not obligate Licensor to give approval to subsequent requests.

**2.03 Area and Scope of Operation.** The license granted hereby is non-exclusive. Licensor shall not be restricted from granting licenses to other persons, including its affiliates, to use the System of Operation, the Names and Marks and the Process and Epoxy in the Operating Territory, or in adjoining trade areas. Licensor agrees, however, that subject to the further provisions of this Section 2.03, Licensor shall not issue more than one license (including licenses granted to its affiliates) to use the System of Operation, the Names and Marks, and the Process and Epoxy to operate a similar business in the market in which the Operating Territory is located, for each 500,000 of population in such market.

(a) Notwithstanding the foregoing, beginning January 1, 2012, Licensor may issue additional licenses in the Operating Territory or the market in which the Operating Territory is located until such time as there is one ACE DuraFlo® "active and productive equipment package" operating in the market in which the Operating Territory is located for each 200,000) population in such market. To be considered an "active and productive equipment package," the equipment must have generated average Gross Receipts of at least $35,000 per month for each of the preceding six months (which $35,000 figure shall be increased by $1,000 per year in each subsequent year).

(b) Notwithstanding the foregoing, if any licensee in the Operating Territory or in the market in which the Operating Territory is located is no longer subject to minimum royalty fees, and such licensee at any time thereafter does not generate at least $30,000 per month in Gross Receipts from its ACE DuraFlo® business for the preceding six months, such license shall not be considered a license granted by Licensor, and Licensor may

grant an additional license in the Operating Territory or the market in which the Operating Territory is located to supplement the production of such licensee, without terminating the license of such licensee.

(c) In defining the market, and in determining the population of a market for purposes of this Section 2.03, Licensor shall use information from the 1996 Statistical Abstract, or any later Statistical Abstract selected by Licensor. Licensor may select from the Metropolitan Statistical Area, the Standard Metropolitan Statistical Area, the Primary Metropolitan Statistical Area, the Consolidated Metropolitan Statistical Area, or if applicable, the New England County Metropolitan Area in determining the relevant market in which the Operating Territory is located, and in determining the population of the market, as Licensor shall deem appropriate in its sole discretion.

(d) Because Licensee does not have the right to use the System of Operation, the Names and Marks or the Process and Epoxy in restoring fire sprinkler systems, Licensor does reserve the right to issue additional licenses in the Operating Territory to persons for the restoration of fire sprinkler systems, provided those persons are not permitted to use any such items in the restoration of other plumbing systems in the Operating Territory.

**2.04 Expiration or Renewal.** If, upon expiration of the initial term or any renewal term of the License, Licensee has complied with all the provisions of the License Agreement which is then expiring, has operated the Licensed Business utilizing and conforming to the System of Operation, has utilized exclusively the Names and Marks in the operation of the Licensed Business, has utilized the Process and Epoxy in all pipe restoration or repair projects undertaken by Licensee in the Operating Territory, has complied with all of its warranty obligations with respect to its work using the Process, and has upgraded the equipment it uses for the Process to meet Licensor's then current standards, Licensee shall have the option to renew the License for an additional term of five years.

(a) To renew the License, Licensee shall execute Licensor's then current form of License Agreement and all other agreements and legal instruments and documents then customarily employed by Licensor in the grant of Licenses and shall pay to Licensor a renewal fee of $1,000 in connection with the renewal of the License, in lieu of any new initial license fee. Licensee shall give Licensor not less than 210 days prior written notice of an election not to renew the License. Failure or refusal by Licensee to execute all agreements and documents within 30 days after delivery to Licensee, or to pay the renewal at that time, shall be deemed an election by Licensee not to renew the License.

(b) If Licensor does not provide Licensee with notice of nonrenewal of the License, but Licensee does not sign a new Licensee Agreement prior to expiration of this Agreement, then at the option of Licensor, this Agreement may be treated either as (i) expired as of the date of expiration with Licensee then operating without a license to do so and in violation of Licensor's rights, or (ii) continued on a month-to-month basis (the "Interim Period") until one party provides the other with written notice of such party's intention to terminate the Interim Period, in which case the Interim Period will terminate 30 days after receipt of the notice to terminate the Interim Period. In the latter case, all obligations of Licensee shall remain in full force and effect during the Interim Period as if this Agreement had not expired, and all obligations and restrictions imposed on Licensee upon expiration of this Agreement shall be deemed to take effect upon termination of the Interim Period.

### III.
### INITIAL PAYMENTS

**3.01 License Fee.** Licensee shall pay to Licensor an Initial License Fee of $24,900. The Initial License Fee shall be due in full on the date Licensee begins operating as an ACE DuraFlo licensee (the "Opening Date"). The Initial License Fee is non-refundable.

**3.02 Equipment Package.** Upon execution of this Agreement, Licensee shall order approved equipment from Licensor for the operation of its business and the application of the Process. Payment for said equipment shall be due not earlier than the Opening Date. The specific contents of this equipment package and terms of purchase shall be as outlined in Exhibit 2 to this Agreement. In addition to paying the cost of such equipment, Licensee shall pay all sales, use and value added taxes with respect to such items, and all applicable shipping charges.

# IV.
# ROYALTIES

**4.01 Monthly Royalty.** Beginning on the Opening Date, Licensee shall pay to Licensor a nonrefundable monthly royalty. Subject to the minimum payment described herein, this royalty shall be 8% of the first $1,000,000 of Gross Receipts of the Licensed Business, and 6% of the Gross Receipts of the Licensed Business exceeding $1,000,000. This calculation is based on the cumulative Gross Receipts of the Licensed Business from its first day of operation.

(a) If the cumulative Gross Receipts of the Licensed Business has not reached $1,000,000 prior to January 1, 2005, then the $1,000,000 figure set forth above shall be increased on January 1 of each year, beginning January 1, 2004, by a fraction, the denominator of which is the most recent Consumer Price Index figure, as hereinafter defined, published as of January 1, 2002, and the numerator of which shall be the most recent Consumer Price Index figure published prior to the date of the adjustment. As used herein, the term "Consumer Price Index," shall mean the United States Department of Labor's Bureau of Labor Statistics, Consumer Price Index, All Urban Consumers, All Items (1982-1884 = 100), or the successor of that index.

(b) Beginning with the month that begins after the 180th day following the date of this Agreement, there shall be a minimum royalty due to Licensor. Such minimum royalty shall begin at $750 per month. Beginning on the second January 1 following the date of this Agreement, the minimum royalty shall increase to $1,000 per month, and beginning on the third January 1 following the date of this Agreement, the minimum royalty shall increase to $1,500 per month. Notwithstanding the foregoing, if the Operating Territory is located in a Metropolitan Statistical Area and has a population of less than 250,000 as of the date of this Agreement, the minimum royalty shall begin at $500 per month, and increase to $750 beginning on the second January 1 following the execution of this Agreement, and to $1,000 beginning on the third January 1 following the execution of this Agreement. All minimum royalties shall terminate if and when the Gross Receipts of the Licensed Business average $30,000 per month for any period of 24 consecutive months.

**4.02 Monthly Royalty Payment Due Date.** The monthly royalties due hereunder shall be due on the 10th day of each month with respect to Gross Receipts of the Licensed Business generated in the immediately preceding calendar month. All royalties shall be transmitted to Licensor in the manner prescribed by Licensor.

**4.03 Taxes.** If any sales, income, excise, use or privilege taxes is imposed or levied by any government or governmental agency on account of the payment of royalties by Licensee under this Agreement, Licensee shall pay to Licensor a sum equal to the amount of such tax as an additional earned service fee (but this provision shall not apply to any federal or state income taxes imposed upon Licensor).

**4.04 Receipts from Subcontract Work.** If Licensee performs any services as a subcontractor to another licensee or franchisee of Licensor, Licensee shall notify Licensor within the earlier of ten business days after executing a contract for a new project, or five business days after commencing work on the project. If Licensee fails to timely report such subcontract work, then any revenues from such contract work shall be included in the Gross Receipts of the Licensed Business, notwithstanding any other provision of this Agreement.

# V.
# ADVERTISING AND PROMOTION

**5.01 Advertising Contributions.** Beginning on the Opening Date, Licensee shall pay to Licensor a monthly "Advertising Contribution" equal to 1.5% of the Gross Receipts of the Licensed Business in the immediately preceding month.

(a) Beginning with the month that begins after the 180th day following the date of this Agreement, there shall be a minimum Advertising Contribution due to Licensor. Such minimum Advertising Contribution shall begin at $150 per month. Beginning on the second January 1 following the date of this Agreement, the minimum Advertising Contribution shall increase to $250 per month, and beginning on the third January 1 following the date of this Agreement, the minimum Advertising Contribution shall increase to $375 per month.

(b) Advertising Contributions will be transmitted to Licensor at the same time and in the same manner as is required of the monthly royalties.

**5.02 <u>Use of Advertising Contributions.</u>**

(a) Reasonable disbursements from the Advertising Fund shall be made solely for the payment of expenses incurred in connection with the general promotion of the Names and Marks and the ACE DuraFlo® license system, including: (i) the cost of formulating, developing and implementing media advertising and public relations campaigns; (ii) the cost of formulating, developing and implementing promotional programs; (iii) the cost of establishing and maintaining a website, a National Account Program, and other tools for generating leads for ACE DuraFlo® businesses; (iv) at the option of Licensor, reimbursement of all or part of each Licensee's cost of purchasing promotional materials used in connection with promotional programs authorized by Licensor; and (v) the reasonable cost of administering the Advertising Fund, including accounting expenses, the actual cost of salaries and fringe benefits paid to Licensor's employees engaged in administration of the Advertising Fund, and an amount equal to 10% of all Advertising Contributions for a particular year for general overhead incurred by Licensor in managing the Advertising Fund. There shall be no requirement that all or any part of the Advertising Fund be disbursed within any accounting period. Losses sustained, or gains accrued, in the Advertising Fund shall carry over to subsequent years. All interest, if any, earned by the Advertising Fund shall be used for the payment of the foregoing expenses before application of any principal to those expenses.

(b) Methods of advertising, selection of media, locale of advertising, and contents, terms and conditions of advertising campaigns and promotional programs shall be within the sole discretion of Licensor. While Licensor may from time to time petition its licensees, individually or as an advisory group, for input on expenditures from the Advertising Fund, and may agree from time to time to be bound by the decisions of an advisory group of licensees, Licensor shall not be bound to solicit such input, or be bound by decisions of such groups. Licensee understands that such advertising is intended to maximize the public's awareness of the ACE DuraFlo® License System and Licensor accordingly undertakes no obligation to ensure that any individual licensee benefits directly or on a pro rata basis from the placement, if any, of such advertising in its local market. If requested by Licensee, Licensor shall provide Licensee an annual statement of the financial condition of the Advertising Fund, certified by an officer of Licensor.

(c) Disbursements from the Advertising Fund shall not be made for the payment of expenses incurred in connection with Licensor's direct marketing of licenses.

(d) Licensor shall have the right to photograph the Licensed Business, and to use these photographs in any advertising or promotional material. Licensor shall not be obligated to compensate Licensee in any way for use of the Licensed Business in connection with photographing the Licensed Business. Licensee shall cooperate in securing photographs and the consent of persons photographed.

(e) Licensor reserves the right to engage the professional services of an advertising agency that is owned by, or is an affiliate of, Licensor or any of its principals.

(f) Advertising material, forms, samples, supplies, products and services may be made available to Licensee at scheduled prices. The purchase price for products, supplies and services purchased by Licensee from Licensor shall be payable upon receipt of an invoice.

**5.03 <u>Web Page.</u>** Licensor may establish a web page to promote the Names and Marks and the Process, and to solicit leads for projects to be undertaken by its licensees or affiliates. If Licensor establishes a web page, it may use contributions to the Advertising Fund to defray a portion of its cost of maintaining the web page. Licensee is not permitted to establish a web page to promote the Licensed Business without the express consent of Licensor, which consent may be withheld for any reason. If Licensor does permit Licensee to establish a web page using the Names and Marks, Licensee will comply with all directives from Licensor with respect to the materials posted on such web page, links to and from the web page, and the use of the Names and Marks on the web page.

**5.04 <u>Telephone Directory Advertising.</u>** At its own expense, Licensee shall obtain an annual yellow page listing in the primary yellow page directory serving each of the geographic areas served by the Licensed Business. At

a minimum, this listing shall consist of a bold heading in such directory. Licensee may satisfy this obligation by purchasing a larger listing cooperatively with other ACE DuraFlo® businesses.

**5.05 Local Advertising and Promotion.** At its own expense, Licensee may conduct advertising campaigns and promotional programs designed primarily to promote the Licensed Business (Local Advertising). Prior to implementing any Local Advertising, Licensee shall submit to Licensor for approval all advertising and promotional material proposed to be used in connection with the Local Advertising. Disbursements shall not be made from the Advertising Fund for the payment or reimbursement of expenses incurred in connection with Local Advertising.

**5.06 Cooperative Advertising.** Licensee will join with other licensees of Licensor in Licensee's market (as such market may be defined from time to time by Licensor) in conducting cooperative advertising designed to benefit all ACE DuraFlo® businesses in the market. Membership in the cooperative shall consist of all ACE DuraFlo® businesses operating in the market, with each business having one vote with respect to all matters to come to the vote of members of the cooperative. All decisions of the cooperative, including decisions as to the nature and content of advertising, and the contributions of each member, shall be determined by the affirmative vote of a majority of businesses represented in the cooperative; provided, however, each member shall be required to contribute either the same amount or the same percentage of its revenues (as determined by the cooperative) to any advertising programs, and Licensee shall not be required to contribute any amounts exceeding, on a quarterly basis, 5% of its Gross Receipts in the preceding calendar quarter. All advertising conducted by the cooperative must meet all requirements for Local Advertising. Licensor shall have the right from time to time to expand, modify and disband cooperatives, and to establish and modify the markets for each cooperative.

## VI.
## SITE SELECTION AND ESTABLISHMENT OF BUSINESS PREMISES

**6.01 The Licensed Business Premises.** Within 90 days of the date of this Agreement, Licensee shall establish a regular, full-time business office within the Operating Territory from which the Licensed Business shall be operated. Such office may, however, be combined with a business office already established by Licensee for a related business.

**6.02 Design, Maintenance and Signage.** While Licensor does not prescribe specific standards for the interior or exterior of the office established by Licensee, the office must be clean, tastefully decorated, and maintained in a manner designed to enhance the goodwill associated with the Names and Marks. Licensee shall place an exterior sign at its office, identifying the Licensed Business. The sign shall meet the criteria established from time to time by Licensor.

**6.03 Permission to Relocate.** Once established, the office may not be moved without the prior consent of Licensor, which consent shall not be unreasonably withheld so long as the new location selected by Licensee is within the Operating Territory and not within near proximity to another ACE DuraFlo® licensee.

**6.04 No Office Outside Operating Territory.** Licensee shall not be allowed to maintain or use an office, branch office, referral office, or any other permanent or temporary office or location outside the Operating Territory.

## VII.
## TRAINING AND ASSISTANCE

**7.01 Training Credits.** Licensor shall credit Licensee with six weeks of training that can be used by Licensee to attend, without charge, any training programs offered by Licensor, including the initial training program Licensee is required to attend. Licensee shall be responsible for all travel and living expense incurred by its personnel in attending these training programs. At no time may Licensee transfer any of its training credits to other franchisees, and such credits shall have no cash value.

**7.02 Initial Training.** Licensor shall provide to Licensee an initial training program. Such training shall include (i) a one week initial orientation program in the operation of a residential ACE DuraFlo® application business, which Licensee or its designated manager must attend within 90 days of the date of this Agreement, (ii) administrator training, which Licensee or its designated office manager must complete within 60 days of the date of this Agreement, (iii) sales training, which Licensee and its designated sales support personnel must complete

at least 30 days before scheduling its first job using the Process, (iv) sales training, which Licensee or its designated manager must complete within 60 days of the date of this Agreement; (v) training on the software Licensor licenses to Licensee, which Licensee or its designated personnel must complete within 60 days of the date of this Agreement, and (vi) when and if Licensee purchases equipment to conduct commercial applications, a one week training program in commercial applications. The initial orientation program and the commercial application program shall be provided at Licensor's principal offices or at such other place as designated by Licensor. All other training may, at Licensor's option, be provided through one or more computer training programs.

**7.03  Training of Replacement Employees.** If any person completing any of Licensor's training programs should leave the employ of Licensee, Licensor will provide additional training to such employee's replacement if Licensee desires to avail itself of such training; provided, however, that Licensee shall pay to Licensor the fees set by Licensor for such additional training if Licensee has exhausted its initial training credits.

**7.04  Additional Training.** From time to time, Licensor will establish additional, ongoing training programs, which Licensee may be required to attend. Such programs may, at Licensor's discretion, be provided at Licensor's offices, at a location outside Licensor's offices, or by telecommunications, Internet, or by mail.

**7.05  Initial Starter Kit.** Licensor shall provide to Licensee an initial "starter kit," including, among others, business cards, samples of advertising materials and promotional pieces, and at least 1,000 direct mail pieces Licensor will mail to prospective customers in the Operating Territory.

**7.06  Confidential ACE DuraFlo® Manuals.** Licensor shall loan to Licensee one or more manuals and other guides as may be developed from time to time by Licensor to assist Licensee in the establishment and operation of the Licensed Business. The manuals so loaned shall be marked "CONFIDENTIAL," shall not be copied in whole or in part by Licensee or its employees or representatives (except for forms which bear a legend indicating they may be copied by Licensee), shall remain the property of Licensor and shall always be kept in safekeeping and in the custody of Licensee at the office of the Licensed Business. Licensor from time to time may add to or modify the manuals to supplement or to improve the System of Operation, the Process, and the contents and methods of promotion licensed hereunder. Licensee shall keep the manuals up to date by inserting any such additions or modifications.

**7.07  Annual Conventions or Seminars.** Licensor may conduct annual conventions or annual seminars for all ACE DuraFlo® licensees. If Licensor conducts annual conventions or annual seminars, Licensee shall attend at least one annual convention or seminar each year, as specified by Licensor, or send an approved representative. Regardless whether or not Licensee attends an annual convention or annual seminar, it shall pay to Licensor any convention registration fee established by Licensor for that convention.

**7.08  Required Additional Programs and Services.** Licensor may, from time to time, provide additional programs and services to Licensee. Unless otherwise approved by Licensor, Licensee is required to participate in all such additional programs in accordance with procedures established from time to time by Licensor.

**7.09  Additional Onsite Support.** Should Licensee require additional onsite support from Licensor, Licensee may request such support in writing to Licensor, outlining the specific support sought. If Licensor has personnel available to provide such support, it shall do so according to Licensor's relevant daily rate as may be set by Licensor from time to time. Licensee shall also be responsible for all travel, lodging and incidental expenses associated with such support.

**7.10  Notice of Inadequate Pre-Opening Services.** If Licensee believes Licensor has failed to adequately provide pre-opening services to Licensee in regard to the initial training, selection and purchase of equipment and supplies, or any other matter affecting the establishment of the Licensed Business, Licensee shall notify Licensor in writing within 30 days following the start of the Licensed Business. Absent the timely provision of such notice to Licensor, Licensee shall be deemed to conclusively acknowledge that all pre-opening and opening services required to be provided by Licensor were sufficient and satisfactory in Licensee's judgment.

**VIII.**
**SERVICING CUSTOMERS; APPLICATION OF THE PROCESS**

**8.01 <u>Process Applications.</u>** Licensee acknowledges that the Process is generally suitable for complex pipe systems, including angles, bends and T-pipes with pipe diameters of up to three inches, and lengths of up to 400 feet, depending on various factors, including the diameter and type of pipe and the equipment utilized in the application. The equipment package Licensor designates as its "residential" package is generally designed for pipe restoration jobs with a maximum pipe diameter of up to one and one-half inches, while the package designated as the "commercial" package is generally designed for a maximum pipe diameter of three inches, but in both cases, the length of the run and other factors can significantly affect the capacity of the equipment. Additional commercial compressors are available that will allow Licensee to complete restoration projects with a pipe diameter of up to six inches.

**8.02 <u>Permission to Conduct Commercial Applications.</u>** Licensee acknowledges that it may not be permitted by Licensor to initially undertake commercial applications of the Process. Licensee acknowledges there is no assurance Licensor will ever authorize Licensee to conduct commercial applications, and Licensee will not attempt to do so until it has been approved for such applications, has purchased a compressor designed for commercial applications, and has completed Licensor's initial training program for commercial applications.

**8.03 <u>No Use of Process in Fire Sprinkler Systems.</u>** Licensee acknowledges that it may not use the Process in the restoration of fire sprinkler systems.

**8.04 <u>Purchase of Epoxy.</u>** Licensor will make available for purchase by Licensee the Epoxy used in the Process. Licensee shall purchase the Epoxy exclusively from Licensor or its designees, and may not use any substitute epoxy or other materials in the application of the Process.

**8.05 <u>Samples and Records.</u>** All applications of the Process shall be conducted strictly in accordance with the instructions and policies of the Licensor. Licensee shall maintain records of all such obligations, as may be directed by Licensor. In addition, Licensee shall draw a sample of the Epoxy used on each job site in accordance with the guidelines and directions provided by Licensor from time to time with regard to sampling epoxy mixtures at job sites. All such samples and documentation shall be maintained indefinitely and shall be available to Licensor for inspection at any time. Licensee acknowledges that strict compliance with the provisions of this section is required to preserve the warranties offered to Licensee by Licensor. Licensee shall notify Licensor immediately of any breach in the requirements of this section, but such notification shall not relieve Licensee of the consequences of such breach.

**8.06 <u>Service Truck Requirements.</u>** Licensee will maintain one or more trucks for transport of its equipment to particular job sites. All such trucks will be properly maintained, and will display Licensor's Names and Marks in the manner specified by Licensor. Licensee may use trucks that it utilizes in a compatible business, provided such vehicles meet Licensor's standards, and bear Licensor's Names and Marks in the manner specified by Licensor.

**8.07 <u>Uniforms and Identification.</u>** All of Licensee's personnel involved in application of the Process, and otherwise interacting in person with customers or prospective customers, shall wear uniforms and identification badges specified by Licensor.

**IX.**
**OPERATION OF THE LICENSED BUSINESS**

**9.01 <u>Manager.</u>** Licensee shall participate in and complete the necessary business and technical training for the application of the Process and use of the System of Operation through training programs offered by Licensor. Only a person who has successfully completed Licensor's initial training programs may manage the Licensed Business. Furthermore, at no time shall any person be involved in the application of the Process who has not been trained in such application.

**9.02 <u>Conduct of Licensed Business.</u>** Licensee shall utilize its best efforts, skill and diligence to ensure that Licensee and Licensee's employees promote the Licensed Business and establish and maintain high quality service to customers. At all times, Licensee shall conduct its business in accordance with Licensor's manuals

and in a manner that will preserve and enhance the goodwill associated with the Names and Marks. Licensee will at all times be held responsible for the day-to-day management of the Licensed Business.

**9.03 Staffing and Telephone.** The office from which the Licensed Business is operated shall be staffed and open during regular business hours. Licensee shall also establish a separate dedicated telephone number for the Licensed Business, which number shall be listed on all advertising for the Licensed Business, and on stationery, invoices, and business cards for the Licensed Business.

**9.04 Compliance with Agreement, Manuals and Law.** Licensee shall comply with all rules, regulations, and directives contained in this Agreement or in the confidential ACE DuraFlo® manuals, as amended from time to time, and shall adopt and adhere to merchandising, promotion, and advertising policies of Licensor. Licensor specifically reserves the right to modify or change such policies, procedures, and directives including, but not by way of limitation, by changing or adding to the Manuals, by changing the process and the equipment used in the process, and by changing or adding to the services to be offered by the Licensed Business. Licensee shall also comply with all laws and regulations pertaining to the operation of the Licensed Business.

**9.05 Internet Access.** Licensee shall install and maintain, at its expense, a high speed Internet access account to maintain sales and marketing information, to transmit and receive marketing leads, to transmit and receive accounting information, to promote communication between Licensee and Licensor, and to take full advantage of the Internet-based ACE DuraFlo Business Center$^{TM}$.

**9.06 Right to Inspect and Corrective Actions.** Licensor and its designated representatives shall, during normal business hours, have the right to make physical inspections of the Licensed Business. If Licensee fails to perform any of its obligations specified in this Article 9, or in Article 10 of this Agreement, or if Licensor reasonably determines that any actions taken by Licensee are injurious to the integrity and goodwill associated with the Names and Marks, Licensor shall provide written notice to Licensee which shall contain a description of Licensee's failure to perform, and the reasonable corrective action to be taken by Licensee. Within 30 days after its receipt of the aforementioned notice, Licensee shall take the corrective action specified in the notice. If Licensee shall in any way fail to maintain the standards of quality or service established by Licensor in the operation of the Licensed Business, Licensor shall also have the right to assign such person or persons that it deems necessary to provide additional training to Licensee or its employees (above and beyond ordinary training and support provided to most licensees) to assure that such standards of quality and service are maintained. Licensee shall pay to Licensor all of Licensor's actual costs for such person so assigned, including wages, travel and living expenses.

**X.**
**NATIONAL ACCOUNTS AND REFERRAL PROGRAMS**

**10.01 National Accounts Program.** Licensor shall establish and maintain a National Accounts Program, wherein Licensor will attempt to create interest in, and develop relationships with, regional or nationally focused companies that make or influence decisions with respect to pipe maintenance and restoration. So long as Licensee is in compliance with this Agreement, Licensee will be given the opportunity to accept jobs generated through the National Accounts Program, through Licensor's website, and through other sources as such opportunities present themselves. Such projects will be offered to licensees and affiliates of Licensor in the Operating Territory in an order established by Licensor. Licensor may arbitrarily offer jobs to such of those licensees and affiliates as Licensor believes in its reasonable discretion have the capabilities to undertake the projects; provided, however, that Licensor will attempt to allocate these referrals in an orderly manner so that each of its licensees and affiliates have a similar number of opportunities for such referrals so long as said Licensee is in compliance with its agreements with Licensor and has the appropriate equipment and training to handle such referrals. Licensor shall not, however, be liable for any errors in judgment or mistakes it may make in allocating such referrals, unless it can be shown Licensor intentionally omitted Licensee from the referral process at a time Licensee was otherwise in compliance with this Agreement.

**10.02 Acceptance of National Account Project.** Licensee shall not be required to accept any project referred to it under Section 10.01; provided, however, that if Licensee refuses a project, it is not entitled to be referred a replacement project. If Licensee accepts a project referred by Licensor, it shall abide by all published policies and procedures with respect to such account, including the pricing of such account, or any fees related thereto.

# XI.
## WARRANTIES

**11.01 Licensee's Warranty.** Apart from Licensor's limited warranty, as described in Section 11.02, Licensee is responsible for all claims made by its customers with respect to Licensee's work, the Process, and Licensee's application of the Process. Licensee shall provide its own warranty of up to a ten-year term to its customers, covering all aspects of the application of the Process. Such warranty, including its terms and conditions, shall be in the form prescribed from time to time by Licensor. Regardless of any warranties provided by Licensor, Licensee shall at all times, at its expense, take corrective action necessary to fulfill its warranty obligations to its customers and to reasonably satisfy its customers.

**11.02 Licensor's Warranty.** Licensor shall provide to Licensee a limited warranty that the Epoxy is free from manufacturing defects. The terms of such limited warranty shall be as set forth on the container containing the Epoxy. If, however, Licensor is required to replace the Epoxy in any application in the Operating Territory pursuant to such warranty, Licensee will, at the request of Licensor, perform such warranty work, but Licensor shall reimburse Licensee for its costs for doing so. Notwithstanding the foregoing, if Licensee misapplies the Epoxy, or otherwise acts contrary to the policies and procedures of Licensor in completing any project and such failure directly or indirectly causes a breach of the warranty on the Epoxy, or if Licensee fails to comply with the provisions of Section 8.05 with respect to the sampling and maintenance of the sample of the Epoxy for such job, then Licensor's warranty to Licensee shall be void, and Licensee shall, at its expense, take corrective action necessary to reasonably satisfy its customer.

# XII.
## NAMES AND MARKS

**12.01 Use of Names and Marks.** Licensee shall operate under, and prominently display, the Names and Marks in the operation of the Licensed Business. Licensee must adopt a trade name for the operation of the Licensed Business; provided, however, that if the trade name includes any of the Names and Marks, Licensor shall have the right to approve the trade name prior to its use by Licensee and shall have the right to require Licensee to modify that trade name if Licensor, in its sole discretion, determines the trade name is inappropriate or not reflective of Licensee's position in the market *vis à vis* other ACE DuraFlo® businesses. Licensee shall use no commercial trade names, service marks, or other commercial symbols, including associated logos that do not satisfy the criteria established by Licensor. Licensee shall not use any of the Names and Marks in combination with other words, letters, prefixes, suffixes, logos or designs, other than in the manner authorized by Licensor. Licensee shall not use the Names or Marks to promote other businesses, including any general plumbing business Licensee may own.

**12.02 No Use of Names and Marks in Legal Name.** If Licensee is a corporation, limited liability company or partnership, Licensee may not use any of the Names and Marks as part of the name of the corporation, limited liability company or partnership. Licensee shall file for and maintain a "Certificate of Trade Name" in the county, or other appropriate jurisdiction, in which the Licensed Business is located.

**12.03 Modification of Names and Marks.** From time to time, upon reasonable notice to Licensee, Licensor may elect to discontinue the use of certain Names and Marks and to commence use of new Names and Marks. Licensee shall pay all expenses incurred in connection with discontinuing the use of existing Names and Marks in the Licensed Business and commencing the use of new Names and Marks therein; provided, however if Licensor does not give Licensee notice to allow for use of any trademarked stationary or marketing materials purchased by Licensee within 90 days preceding the date of the notice that will become obsolete, Licensor will purchase from Licensee, at Licensee's cost, such of those materials as were originally purchased from Licensor.

**12.04 Prohibition Against Disputing Licensor's Rights.** Licensee acknowledges that its right to use the Names and Marks is derived solely from this Agreement and that all such usage and any goodwill established thereby shall inure to the exclusive benefit of Licensor. Licensee shall not at any time challenge the Names and Marks, or Licensor's ownership of or right to use or license the Names and Marks.

**12.05 Termination or Expiration.** Licensee agrees that, upon the termination or expiration of the License for any reason whatsoever, Licensee shall forthwith discontinue the use of the Names and Marks, and thereafter shall no longer use, or have the right to use, the Names and Marks.

Exhibit A, Page 13

**12.06** **Infringement Claims.** Licensee shall immediately notify Licensor of any infringement of or challenge to Licensee's use of present and future Names and Marks and shall not communicate with any other person in connection with any such infringement, challenge or claim. Licensor shall have sole discretion to take such action as it deems appropriate, including the exclusive control of any litigation or any Trademark Office or other administrative proceeding arising out of any such infringement, challenge or claim relating to any of the Names and Marks.

**12.07** **Requirement to Protect Integrity and Goodwill of Names and Marks.** Licensee shall take all actions reasonably necessary to maintain the integrity of the Names and Marks and preserve and protect the goodwill associated with the Names and Marks. These actions shall include, without limitation, the following:

(a) Use of the Names and Marks shall in every instance be accompanied by the appropriate trademark or service mark symbol indicating its registration status, i.e. "®", "™" or "SM", as specifically directed by Licensor. In addition, any and all brochures, advertisements, and other promotional materials bearing the Names and Marks shall contain statements proscribed from time to time by Licensor, referencing the Marks, and confirming the registration status and their ownership by Licensor or its affiliates.

(b) Within ten days after the date Licensee receives notice of any customer or consumer complaint about the operation of the Licensed Business, Licensee shall prepare and deliver to Licensor a written report that provides details relating to the nature of the complaint and any corrective action taken by Licensee.

(c) The operation of the Licensed Business shall in all respects comply with the applicable rules and regulations of the various local, state, and federal agencies that regulate the repair and restoration of piping systems, or use of the Process.

**XIII.**
**SUPPLIES**

**13.01** **Payment for Purchases from Licensor.** Equipment, products, supplies, and services purchased by Licensee from Licensor shall be payable upon the receipt of an invoice. Fees or charges for products, supplies, or services furnished by Licensor and not paid within ten days of receipt of an invoice therefor, as well as royalties and Advertising Contributions not received by Licensor by the 20th day of the month in which the same are due, shall bear interest from the due date at the maximum rate permitted by law, not to exceed 1.5% per month.

**13.02** **Purchase Requirements for Certain Equipment and Supplies.** Licensee shall purchase all critical equipment for the Process, including compressors, epoxy mixer, sander, header(s), prefilter(s) and filter(s), exclusively from Licensor or its designees. If Licensor is not the supplier for any of these items, Licensor will provide Licensee the names of the approved supplier or suppliers for such items, and such items must be purchased from the approved suppliers. Licensor may also provide Licensee lists of recommended suppliers of forms, signs, supplies, marketing materials, and other items necessary to operate the Licensed Business. The recommended source of supply for any individual item may be Licensor, an affiliate of Licensor, or an independent contractor. Licensee can purchase these additional items from any supplier of its choosing, provided such supplier can provide quality items that would otherwise meet Licensor's specifications and requirements.

**13.03** **Other Equipment and Supplies.** With respect to items purchased by Franchisee for use in the Licensed Business other than those referenced in Section 13.02 above, Licensor reserves the right to provide specifications for those items, and to require Licensee to obtain Licensor's consent to the purchase of any such items that do not meet Licensor's specifications.

**13.04** **Limitation on Liability.** Licensor shall not be liable to Licensee for damages caused by the failure of Licensor or an approved or recommended supplier to make available for purchase any item, unless the failure is the result of factors within Licensor's reasonable control.

Exhibit A, Page 14

**XIV.**
**METHOD OF PAYMENT OF FEES, FINANCIAL INFORMATION, REPORTS, AND AUDITS**

**14.01 Records Required.** Licensee shall maintain complete and accurate records, accounts, books, data and reports that accurately reflect all particulars linked to or arising out of the Licensed Business. Such information shall be maintained in the manner reasonably required by Licensor. Licensee shall purchase and install hardware, with high speed Internet access, for use in its business. Licensor shall provide to Licensee a license to use software that will enable Licensee to develop a database for the Licensed Business. All information in such database shall be considered the property of Licensor. Initially, one license will be provided at no cost to Licensee, with additional licenses available from the Licensor if Licensee desires to purchase such additional licenses. Licensor may, however, at any time, modify or terminate its relationship with this vendor, in which case the license provided by Licensor may be eliminated, or, at Licensor's option, replaced by a license with another vendor or a custom program.

**14.02 Segregation of Records.** If Licensee transacts another business from the premises of the Licensed Business, all records connected to such other operations will be kept in a manner necessary to effect a convenient segregation from the Licensed Business. If such businesses exist on the date of this Agreement, Licensee shall notify Licensor within ten business days following the date of this Agreement (and with respect to future business operations that may be commenced, within ten business days of the commencement of such businesses), or all revenues from such businesses shall be considered revenues related to the Licensed Business, and thereby included in Gross Receipts.

**14.03 Bank Account.** Licensee shall maintain a bank account for the Licensed Business and shall deposit to that account all revenues received by the Licensed Business in a timely manner (not less than once each week). At all times, Licensee shall maintain a minimum balance of $5,000 in that account. Licensee shall notify Licensor of the bank in which the account is maintained, as well as the account number, and shall notify Licensor at least ten days prior to making any material change in the account, including the name of any signatory on the account or the location of the account. At the option of Licensor, all amounts owing to Licensor by Licensee, including amounts due for royalties, Advertising Contributions, products, supplies and equipment, will be payable by electronic funds transfer. Licensee shall execute such documents as may be required from time to time by Licensor to permit Licensor to withdraw these amounts on their due date from Licensee's general operating account.

**14.04 Financial and Sales Reporting.** Licensee shall provide Licensor with such weekly, monthly, quarterly, and annual financial and sales information relating to the business of Licensee from time to time as may be reasonably required by Licensor. All financial and sales information to be delivered to Licensor shall be in the form and by the means of communication authorized by Licensor. All monthly financial and sales information shall be prepared in accordance with generally accepted accounting principles and in the form prescribed by Licensor and shall be received by Licensor no later than the 20th day of the following month. Licensee shall maintain annual financial statements, including statements of operation of the Licensed Business prepared in accordance with generally accepted accounting principles, which statements shall be sent to Licensor upon request by Licensor.

**14.05 Audit.** Licensor shall have the right to audit or cause to be inspected, audited, and copied the sales reports and financial statements delivered to Licensor, and the books, records and sales and income tax returns of Licensee and, if Licensee is a corporation, limited liability company or partnership, the owners, members or partners of Licensee (provided, however, Licensor shall only have this right to audit the tax returns of the owners, members, or partners of Licensee if Licensor's investigation of the books, statements and other records of Licensee discloses errors in reported gross sales of Licensee). Such records shall include not only records of the Licensed Business, but records of any other business operated from the premises of the Licensed Business. If any audit discloses an understatement of the Gross Receipts of the Licensed Business for any period or periods, Licensee, within ten days of receipt of the audit report, shall pay to Licensor the Advertising Contributions and royalties, if any, due on the previously unreported Gross Receipts, plus interest from the due date at the maximum rate permitted by law, not to exceed one and 1.5% per month. In addition, if an understatement for any period equals 2% or more of the Gross Receipts of the Licensed Business for the period, Licensee shall reimburse Licensor for the cost of the audit, including, without limitation, the charges of any independent accountant and the travel expenses, room and board, and compensation of persons employed by Licensor to make the audit. Reimbursement to Licensor for the costs of the audit shall be made upon the

Exhibit A, Page 15

receipt of an invoice therefor. Such costs not reimbursed within ten days of receipt of an invoice shall bear interest from the due date at the maximum rate permitted by law, not to exceed 1.5% per month.

## XV.
## INSURANCE

**15.01 Insurance Required.** At all times during the term of the License, Licensee shall maintain in force, general comprehensive public liability insurance with a products liability endorsement protecting against claims for bodily and personal injury, death and property damage caused by, or incurred in conjunction with, the operation of, or conduct of the Licensed business; motor vehicle liability insurance; and workers' compensation insurance.

**15.02 Policy Requirements.** All insurance coverage required above shall be maintained under one or more policies of insurance containing the amounts and types of coverage from time to time prescribed by Licensor. Such coverage must be obtained from insurance companies rated "AAA" by Alfred M. Best & Company, Inc., or such other insurance companies approved in advance by Licensor. All errors and omissions, and public liability and motor vehicle liability insurance policies, shall name Licensor as an additional insured and shall provide that Licensor receive ten days' prior written notice of termination, expiration, reduction or cancellation of any such policy. Licensee shall submit to Licensor, annually, a copy of the certificate of or other evidence of the renewal or extension of each such insurance policy.

**15.03 Failure to Maintain.** If Licensee at any time fails or refuses to maintain any insurance coverage required by Licensor, or fails to furnish satisfactory evidence thereof, Licensor, at its option and in addition to its other rights and remedies hereunder, may obtain such insurance coverage on behalf of Licensee, and any costs of premiums incurred by Licensor in connection therewith shall be paid by Licensee on demand.

## XVI.
## CONFIDENTIALITY AND IMPROVEMENTS BY LICENSEE

**16.01 Confidentiality.** Licensee acknowledges that all of the information it has now or obtains in the future concerning the System of Operation, the Process, and the concepts and methods of promoting the Licensed Business, including but not limited to, all information, manuals, materials, expertise, intellectual property (regardless of form), proprietary software, and techniques and details of the Process is derived from Licensor pursuant to this Agreement, and that such information (collectively, "Confidential Information") will be treated in confidence.

(a) Licensee agrees never to, directly or indirectly, engage in or abet the misappropriation, or the disclosure, divulgence, or distribution of all or any part of the System of Operation and the concepts and methods of promoting licenses hereunder, or any Confidential Information except on a need to know basis as ordered by any regulator, or judicial authority having legal jurisdiction. Further, Licensee shall require all personnel employed in the Licensed Business, as a condition to their employment, to enter into an agreement, enforceable by Licensor, to treat such information as confidential.

(b) Licensee acknowledges that Licensor's business and the ability of Licensor and its other licensees to compete for business is dependent on the preservation of the confidential nature of the Confidential Information, and that it is essential that Licensee agree to maintain such secrecy and confidentiality as a condition for Licensor to reveal the Confidential Information to Licensee. Licensee further acknowledges it would not have been extended the opportunity to become a licensee of Licensor except for its agreements as contained in this Article 17, and its agreement to maintain the Confidential Information as a trade secret.

**16.02 Prohibition Against Challenging Licensor's Patents or Copyrights.** Licensee will not challenge any Patent, copyright, or patent or copyright application, of Licensor or Licensor's affiliates with respect to the Process, the System of Operation, or any item related thereto, or the ownership of, or right to use or license such items.

**16.03 Improvements to System of Operation Developed by Licensee.** If Licensee, during the Term of the License, conceives or develops any improvements or additions to the System of Operation, or the Process, copyrightable works, Internet web pages or any other documents or information pertaining or relating to the Process, the System of Operation or the Licensed Business, or any new trade names, trade and service marks

or other commercial symbols related to the Licensed Business, or any advertising and promotion ideas related to the Licensed Business ("Improvements"), Licensee shall fully disclose the Improvements to Licensor, without disclosure of the Improvements to others, and shall obtain Licensor's written approval prior to the use of such Improvements. Licensee and all other licensees of Licensor may thereafter use any such Improvement approved by Licensor without any obligation to Licensee for royalties or similar fees. Licensee shall assign to Licensor, without charge, any rights for such Improvement, including the right to grant sublicenses to any such Improvement. Licensor, at its discretion, may make application for and own copyrights, patents, trade names, trademarks and service marks relating to any such Improvement and Licensee will cooperate with Licensor in securing such rights. Licensor also may consider such Improvements as the property and trade secret of Licensor. Licensor shall authorize Licensee to utilize any Improvement authorized generally for use by other licensees.

**16.04  Licensor's Right to Access Information.** Licensee acknowledges and agrees that all information contained in databases prepared by Licensee or Licensor and contained in any software systems used by Licensee belongs to Licensor, and Licensor shall be allowed to access such information from the computer databases of Licensee. If requested by Licensor, Licensee shall transfer this information to Licensor.

**XVII.
COMPETITION**

**17.01  Non-Competition Restrictions During the Term of the Agreement.** Licensee acknowledges Licensor must be protected against the potential for unfair competition by Licensee's use of Licensor's training, assistance and trade secrets in direct competition with Licensor. Licensee further acknowledges that Licensor would not have entered into this License Agreement or shared information with Licensee concerning the Process or the System of Operation, absent Licensee's agreement to strictly comply with the provisions of this Article 17. Licensee therefore agrees that it shall not, during the term of this Agreement:

(a) Engage in a Competitive Business or perform services for a Competitive Business directly or indirectly, as a director, owner, proprietor, officer, manager, employee, consultant, representative, agent, independent contractor or otherwise, except under a license or franchise agreement with Licensor; or

(b) Have any direct or indirect interest in any entity that is awarded or is awarding licenses or franchises to others to operate any Competitive Business, except new licenses/franchises under license/franchise agreements with Licensor; or

(c) Engage in any activity to solicit, encourage or induce any customer doing business with any licensee or franchisee of Licensor, wherever located, to cease or limit its business with such licensee or franchisee; or

(d) Directly or indirectly, on behalf of Licensee or any other person, solicit, divert, take away or interfere with any of the business, customers, clients, contractors, trade or patronage of Licensor or any other licensee or franchisee of Licensor.

**17.02  Exception for *De Minimus* Ownership Interest in Public Company.** Notwithstanding any other provision of this Article XVII, Licensee may have an ownership of less than 5% of the issued and outstanding shares of any class of stock of a publicly traded company, provided Licensee is otherwise not actively involved in the management or operation of that business and does not serve that business in any other capacity.

**17.03  Non-Competition Restrictions Following Expiration or Termination.** The restrictions set forth in clauses (a) and (b) of Section 17.01 shall continue for a period of two years following the expiration of this Agreement, assignment of this Agreement by Licensee, termination of this Agreement (regardless the cause for termination or the party exercising the right to terminate), but the restrictions shall be limited to the Operating Territory, and a radius of 20 miles of any other licensee or franchisee of Licensor. If Licensee violates any of those restrictions during such two-year period, then the restrictions contained herein shall be extended and continued until two years after the cessation of all such violations. Licensee acknowledges that such restrictions are reasonable and necessary to protect the interests of Licensor and other licensees or franchisees of Licensor, and that because of the limited nature of the geographic scope of the restrictions, and the limitation of the restrictions to those involving a Competitive Business, they do not unduly restrict Licensee's ability to engage in gainful employment. If Licensee violates these restrictions, then in addition to damages incurred by

Licensor for which Licensee shall be liable, Licensor shall be entitled to injunctive relief to prevent the continuation of such breach.

## XVIII.
## ASSIGNMENT

**18.01 Assignment by Licensor.** This Agreement is fully assignable by Licensor, and shall inure to the benefit of any assignee or other legal successor in interest of Licensor.

**18.02 Permission Required for Assignment by Licensee.** No Licensee, partner (if Licensee assigns this Agreement to a partnership), shareholder (if Licensee assigns this Agreement to a corporation), or member (if Licensee assigns this Agreement to a limited liability company) without the prior written consent of Licensor, by operation of law or otherwise, shall sell, assign, transfer, convey, give away, or encumber to any person, company or partnership or other legal entity, its interest in this Agreement or its interest in the License granted hereby or its interest in any proprietorship, partnership, limited liability company or corporation which owns any interest in the License. Any purported assignment not having the necessary consent shall be null and void and shall constitute a material default hereunder.

**18.03 Assignment of Minority Interest by Licensee.** Licensor shall not unreasonably withhold its consent to any assignment of less than 50% of the beneficial or voting interest in the License or the Licensed Business, provided such transfer is not part of a series of transfers intended to evade this provision, and further provided:

(a) The transferee shall enter into a written agreement with Licensor, in a form satisfactory to Licensor, assuming and guaranteeing all of Licensee's obligations hereunder;

(b) Any defaults under this Agreement on the part of Licensee have been remedied; and

(c) Such other reasonable conditions as may be required by Licensor in connection with the transfer or assignment have been satisfied.

**18.04 Assignment of Majority Interest by Licensee.** If an assignment, alone or together with other previous, simultaneous, or proposed assignments, would have the effect of transferring 50% or more of the beneficial or voting interest in the License, the Licensed Business, or the operation of the Licensed Business, Licensor will not unreasonably withhold its consent to the assignment if all of the following conditions and requirements have been satisfied:

(a) The transferee shall be of good moral character and reputation, shall have a good credit rating, financial capabilities and competent business qualifications reasonably acceptable to Licensor. Licensee shall provide Licensor with the information it may reasonably require to make a determination concerning the proposed transferee;

(b) The assignee or a designated representative of the assignee approved by Licensor to manage the Licensed Business must satisfactorily complete Licensor's training program (and pay to Licensor its then current training fee) before the assignee may assume responsibility for the operation of the Licensed Business;

(c) The transferee must execute a new License Agreement, in the form then used by Licensor in the grant of new franchises; provided, that in lieu of the transferee paying a new Initial License Fee, the transferee or Licensee shall have fully paid and satisfied all of Licensee's obligations to Licensor and Licensee shall fully pay to Licensor a transfer fee. The transfer fee shall equal 40% of Licensor's then current initial license fee, or if Licensor is not then offering licenses, then a transfer fee of $10,000; provided, however, Licensee shall not be required to pay a transfer fee in the event the transferee is a spouse or an adult child (at least 21 years old). If Licensee transfers more than one license at the same time to the same entity, only one transfer fee shall be charged, and if the amount of the transfer fee differs among the agreements transferred, the fee paid shall be the higher of the fees;

(d) If the transferee is a corporation, limited liability company or partnership, all the shareholders, members or partners of the transferee shall enter into a written agreement, in a form satisfactory to Licensor, jointly and severally guaranteeing the full payment and performance of the transferee's obligations to Licensor

ACE DuraFlo-LIA-FTC-040104                                    -15-

and agreeing to be personally bound by all covenants and restrictions imposed upon the transferee under the terms of this Agreement;

(e) Licensee shall execute a general release of Licensor and its officers and directors in form and substance satisfactory to Licensor;

(f) The transferee shall provide Licensor proof of insurance in types and amounts meeting the requirements of this Agreement, including the name of Licensor as an additional insured;

(g) If Licensee or Licensee's owners finance any portion of the purchase price, such persons must execute a subordination agreement, in form reasonably required by Licensor, agreeing to subordinate the transferee's obligations to such persons to the obligations of the transferee to Licensor; and

(h) If the assignment or transfer is caused by the death or incapacity of Licensee (or in the case of a partnership, limited liability company or corporation, by the death or incapacity of one controlling 50% or more of the voting or beneficial interest of Licensee), the provisions of this Section 18.04 must be met with regard to the heir or personal representative of Licensee succeeding to Licensee's interest hereunder; provided, however, if the heir or personal representative assigns, transfers or sells its interest in the License within 90 days after the death or incapacity of Licensee, the person to whom the interest is assigned, transferred or sold, and not Licensee's heir or personal representative, must comply with the provisions of this Section 18.04 as transferee.

## XIX.
## RIGHT OF FIRST REFUSAL

If, at any time during the term hereof, Licensee receives a *bona fide* offer to purchase the License or the Licensed Business, which offer Licensee is willing to accept, Licensee shall communicate in writing to Licensor the full terms of the offer and the name of the offeror. Licensor may elect to purchase the Licensed Business on the terms set forth in the offer. If Licensor elects to purchase the same, it shall give Licensee written notice of the election within 20 days after Licensor receives Licensee's communication of the offer. If Licensor fails to give written notice of election within 20 days, Licensee may sell to the offeror on the terms offered, subject to the provisions relating to assignment. The sale must, however, be completed within 60 days of the termination of the 20 day period during which Licensor may give written notice of election to purchase; otherwise, an additional notice must be given to Licensor and an additional option period must expire prior to any such transfer. If Licensor elects to purchase the Licensed Business, it shall have the right to substitute equivalent cash for any noncash consideration included in the bona fide offer to purchase and Licensor and Licensee will use their best efforts to complete the purchase within 20 days from the date of Licensor's notice of election to purchase.

## XX.
## PRE-TERMINATION OPTIONS OF THE FRANCHISOR

**20.01 Pre-Termination Options.** Prior to the termination of this Agreement, if Licensee fails to pay any amounts owed to Licensor or its affiliates, or fails to comply with any term of this Agreement, then in addition to any right Licensor may have to terminate this Agreement or to bring a claim for damages, Licensor shall also have the option:

(a) To suspend the listing of the Licensed Business from any advertising, promotions or listings sponsored or distributed by Licensor, including such items as may be paid for in whole or in part by the Advertising Fund;

(b) To cease providing referrals to Licensee, without any right of Licensee to receive additional "make-up" referrals if Licensee brings itself into compliance with this Agreement; and

(c) To suspend all services provided to Licensee under this Agreement or otherwise, including but not limited to training (regardless whether Licensee has outstanding training credits), marketing assistance, and the sale of marketing materials and other products and supplies.

**20.02 Effect of Pre-Termination Options.** Licensor's actions as outlined in this section may continue until Licensee has brought its accounts current, cured any default, and complied with Licensor's requirements, and

Exhibit A, Page 19

Licensor has acknowledged the same in writing. The taking of any of the actions permitted in this section shall not suspend or release Licensee from any obligation that would otherwise be owed to Licensor or its affiliates under the terms of this Agreement or otherwise. Licensee acknowledges that such actions would not impair Licensee's ability to continue in business and will not constitute a constructive termination of this Agreement.

## XXI.
## TERMINATION

**21.01** __Termination by Licensee.__ Licensee may terminate this Agreement (and the License granted hereunder) effective ten days after delivery to Licensor of notice of termination, if Licensee is in compliance with this Agreement and Licensor breaches this Agreement and fails to cure the breach within 30 days after written notice of the breach is delivered to Licensor.

**21.02** __Termination by Licensor Without Prior Notice.__ Licensor may terminate the License Agreement effective immediately upon receipt by Licensee of notice of termination, if:

(a) Licensee voluntarily abandons the License by failing to operate the business for five consecutive days during which Licensee is required to operate the business under the terms of the License Agreement, or any shorter period after which it is not unreasonable under the facts and circumstances for Licensor to conclude that Licensee does not intend to continue to operate the License, unless such failure to operate is due to fire, flood, earthquake, or other similar causes beyond Licensee's control; provided, however, if Licensee takes a vacation of two weeks or less during a calendar year, this shall not trigger Licensor's right to terminate the License Agreement if Licensee has made arrangements to have the phones answered (by a person or a machine) and Licensee otherwise demonstrates an appearance of being in business;

(b) Licensee is convicted of a felony or any other criminal misconduct which is relevant to the operation of the Licensed Business;

(c) Licensee fails to cure a default under this Agreement which materially impairs the goodwill associated with the Names and Marks;

(d) Licensee or the business to which the License relates is declared bankrupt or judicially determined to be insolvent, or all or a substantial part of the assets thereof are assigned to or for the benefit of any creditor, or Licensee admits its inability to pay its debts as they come due;

(e) Licensor and Licensee agree in writing to terminate the License;

(f) Licensee, after curing any failure for which Licensee is given 30 days' notice and an opportunity to cure, engages in the same noncompliance, whether or not such noncompliance is corrected after notice;

(g) Licensee makes an unauthorized assignment or transfer of the License Agreement, the Licensed Business, or the License;

(h) Licensee makes any material misrepresentations relating to the acquisition of the License;

(i) Licensee engages in conduct which reflects materially and unfavorably upon the operation and reputation of the Licensed Business or the ACE DuraFlo® system;

(j) Licensee fails, for a period of ten days after notification of noncompliance, to comply with any federal, state, or local law or regulation applicable to the operation of the License, or to correct any deficiencies in connection with its application of the Process;

(k) A levy of execution has been made upon the license granted under the License Agreement and it is not discharged within five days of such levy;

(l) Licensor makes a reasonable determination that continued operation of the License by Licensee will result in an imminent danger to public health or safety;

ACE DuraFlo-LIA-FTC-040104

-17-

(m) Licensee fails to submit financial statements, sales information or other supporting records as set forth herein for a period of 30 days after they are due or submits to Licensor two or more sales reports, financial statements, other information, or supporting records in any period of 12 consecutive months which understate by 2% or more the Gross Receipts of the Licensed Business, or materially distort any other material information; or

(n) Licensee fails to maintain Licensor's protocols with respect to the duty to maintain and control Epoxy samples.

**21.03 Termination by Licensor With Prior Notice.** Licensor may also terminate this Agreement for any other reason constituting good cause, including, but not limited to, the failure of Licensee to comply with any requirement of this Agreement, and failure to pay any monies owed to the Licensor or its affiliates, after being given notice of such failure and 30 days in which to cure such failure.

**21.04 Statutory Limitations.** The foregoing notwithstanding, to the extent that the provisions of this License Agreement provide for periods of notice less than those required by applicable law, or provide for termination, cancellation, nonrenewal or the like other than in accordance with applicable law, such provisions shall, to the extent such are not in accordance with applicable law, be superseded by said law, and Licensor shall comply with applicable law in connection with each of these matters.

**21.05 Requirements of Licensee Upon Termination or Expiration.** Licensee agrees, upon termination or expiration of the License, to immediately:

(a) return to Licensor all copies of all manuals, whether printed or electronic, that have been loaned to it by Licensor, and any material marked as property of Licensor or as confidential;

(b) return all software provided, loaned, or licensed to Licensee by Licensor, and all marketing materials bearing the Names and Marks;

(c) transmit to Licensor, in a form requested by Licensor, all information of Licensee contained in the database for the Licensed Business referenced in Section 14.01 of this Agreement; and

(d) inform Licensor of all pending applications of the Process, and provide such information to Licensor as Licensor may request in order to assign those projects to other persons. Licensee shall thereafter take no action to interfere with the reassignment of such projects, nor shall Licensee contract for or commence any new applications of the Process.

**21.06 Payments Following Expiration or Termination.** Within five days after the effective date of termination or expiration of the License, Licensee shall pay to Licensor such royalties and other charges as have or will thereafter become due hereunder and are then unpaid and all amounts due for printed materials, forms, advertising material, samples, supplies, products and services supplied by Licensor.

**21.07 Cancellation of Domain Names, Telephone Numbers and Directory Listings.** Upon termination, expiration or assignment of the License, Licensee shall expeditiously take such action as may be required to properly cancel all domain names and any assumed name or equivalent registrations relating to the use of the Names and Marks, to notify the telephone company, any internet service provider, domain name registrar, and all listing agencies of the termination or expiration of Licensee's right to use the domain names, telephone numbers and classified and other directory listings associated with the Names and Marks and to authorize the telephone company and listing agencies to transfer to Licensor all such telephone numbers, domain names, and directory listings. Licensee acknowledges that, as between Licensor and Licensee, Licensor has the sole right to and interest in all telephone numbers, domain names, and directory listings associated with the Names and Marks. Licensee authorizes Licensor, and appoints Licensor its attorney-in-fact, to direct the internet service provider, domain name registrar, telephone company and all listing agencies to transfer domain names, telephone numbers and listings to Licensor. Licensee acknowledges that Licensee's right to use any website or web page provided to Licensee by Licensor shall terminate upon termination, expiration or assignment of the License.

**21.08 <u>Removal of Signage.</u>** Immediately upon termination or expiration of the License, Licensee shall cause all interior and exterior signs identifying the business premises as an ACE DuraFlo® business, and ACE DuraFlo® signs or logos appearing on any vehicles, to be removed. If Licensee fails to remove the sign(s), Licensor shall be entitled to remove the sign(s), without prior notice to Licensee.

**21.09 <u>No Further Identification.</u>** After the termination or expiration of the License, Licensee shall not indicate directly or indirectly, in any manner, that it is or ever was affiliated with Licensor in any capacity. Thereafter, Licensee may not identify itself or any business as an ACE DuraFlo® business or as a licensee of, or as otherwise associated with, Licensor, or use, in any manner or for any purpose, any of the System of Operation, the Process, the Names and Marks, or any other indicia of an ACE DuraFlo® business.

**21.10 <u>Survival of Certain Obligations.</u>** All obligations of Licensor and Licensee that expressly or by their nature survive the expiration or termination of the License shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement until they are satisfied in full or by their nature expire.

**XXII.**
**ENFORCEMENT AND DISPUTE RESOLUTION**

**22.01 <u>Injunctive Relief.</u>** Licensor may apply for injunctive or other equitable relief to enforce its right to terminate this Agreement for cause, to prevent or remedy a breach of this Agreement by Licensee if such breach could materially impair the goodwill associated with Licensor's Names and Marks, to collect monies due to Licensor, and to enforce the provisions of Articles XVI, XVII, XVIII and XIX hereof. Licensor shall be entitled, without bond, to the entry of temporary restraining orders, and temporary and permanent injunctions enforcing the aforementioned provisions. If, however, a court determines that under law a bond must be posted, Licensee agrees that the bond shall not exceed $5,000.

**22.02 <u>Attorneys' Fees and Costs.</u>** If Licensor is successful in obtaining an injunction, or any other judicial relief or order from an arbitrator against Licensee, or in successfully defending any claim Licensee has brought against Licensor, Licensee shall pay Licensor an amount equal to Licensor's costs of prosecuting or defending the action, including reasonable attorneys' fees, costs of investigation, court and arbitration costs, and other litigation or arbitration expenses. Licensor's right to obtain injunctive or other equitable relief is in addition to any other right Licensor may have under this Agreement and will in no way limit or prohibit Licensor from obtaining money damages from Licensee in the event of Licensee's breach of this Agreement.

**22.03 <u>Mediation.</u>** Except to the extent Licensor believes it is necessary to seek equitable relief as permitted in Section 22.01, or to recover royalties or other amounts owed to it by Licensee, Licensor and Licensee each agree to enter into mediation of all disputes involving this Agreement or any other aspect of the relationship between us, for a minimum of four hours, prior to initiating any legal action or arbitration against the other.

(a) Upon written notice by either party to the other of its desire to mediate, the party receiving the notice will select an independent entity that provides mediation services to serve as mediator in the proceeding. If the party receiving the notice of intent to mediate does not name such an organization within ten days from the date the notice of intention to mediate is received, then the other party may proceed as if this Section 22.03 did not exist, or, at its option, make the selection of the organization to provide mediation services. If either party selects an organization that is unwilling to serve as mediator, then the other party may select the organization. Once the organization is designated and agrees to accept the appointment as mediator, the organization will be directed to schedule a mediation proceeding at a time mutually convenient to all parties. The mediation will be held within 30 days following receipt by the mediation organization of notification that its services are requested. If Licensor and Licensee cannot agree on a date for mediation, then the mediation organization will select a date it believes is reasonable for both parties, given all of the claimed conflicts in dates. The person actually mediating the dispute will be required to have at least ten years of experience as either a franchisee or franchisor (or as an officer of such an entity) or in franchise law. Licensor and Licensee will equally share the cost of the mediator. The mediator will select the location for the mediation, but unless both Licensor and Licensee agree otherwise, the mediation will be held in a metropolitan area with at least 250,000 persons that is not within 100 miles of either Licensor or Licensee's principal office or our principal office.

(b) Except for matters where the parties hereto are permitted to bring an action or arbitration without first mediating the dispute, if either party initiates litigation or arbitration without complying with their obligation to mediate in accordance with this section (unless the other party has failed to respond on a timely basis or has indicated it will not engage in mediation in accordance with the provisions of this Section 22.03), then upon petition of whichever party has a lawsuit or arbitration proceeding brought against it, the court or arbitrator will dismiss the litigation or arbitration without prejudice, and award attorneys' fees and costs to the party seeking dismissal in an amount equal to the attorneys' fees and costs the party seeking dismissal incurred. If the court or arbitrator refuses for any reason to dismiss the action, then regardless of the outcome of the action, or of any award given in the action, the party initiating the litigation or arbitration will be responsible for all attorneys' fees and costs incurred throughout the litigation or arbitration by the other party as damages for failing to comply with the provisions of this Section 22.03.

**22.04  Arbitration.** Except insofar as Licensor elects to enforce this Agreement by judicial process and injunction as provided in Section 22.01, all disputes and claims relating to any provision of this Agreement or to any of Licensor's standards or operating procedures, or other obligation of either Licensor or Licensee, or to the breach thereof (including any claim that this Agreement, any provision of this Agreement, any specification, standard, operating procedure or any other obligation of Licensor or Licensee is illegal, unenforceable or voidable), or any aspect of the relationship between Licensor and Licensee (even if additional persons are named as parties to such action), must be resolved by arbitration in Orange County, California, or if Licensor's principal office is not located in Orange County, California, then at the office of the American Arbitration Association located closest to Licensor's principal office. It is Licensor's intention that state laws attempting to void out of state forum selection clauses for arbitration be preempted by the Federal Arbitration Act and that arbitration be held in the place designated above.

(a) The arbitration will be held in accordance with the United States Arbitration Act (9 U.S.C. § 1 et seq.), if applicable, and the rules of the American Arbitration Association relating to the arbitration of disputes arising under franchise agreements, if any; otherwise, the general rules of commercial arbitration.

(b) The arbitrator appointed must have at least ten years' experience in franchising or franchise law, and the arbitrator will be instructed that he or she must follow the substantive law and the other requirements, waivers and limitations of this Agreement. The arbitrator shall have no authority to add, delete or modify in any manner the terms and provisions of this Agreement. All findings, judgments, decisions and awards of the arbitrator will be limited to the dispute or controversy set forth in the written demand for arbitration and response to that demand. The arbitrator will have the right to award or include in any award the specific performance of this Agreement, but will be required to file a reasoned brief with his or her award.

(c) Licensor and Licensee acknowledge that judgment upon an arbitration order may be entered in any court of competent jurisdiction and will be binding, final, and nonappealable except as permitted under the United States Arbitration Act or for failure of the arbitrator to meet the requirements of this Section 22.04.

(d) In connection with any such arbitration proceeding, each party must submit or file any claim which would otherwise constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure of the United States) within the same proceeding as the claim to which it relates. Any such claim that is not so submitted or filed will be forever barred.

(e) Notwithstanding any other provision of this Agreement, all issues relating to arbitrability or the enforcement of disagreement to arbitrate shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and the federal common law of arbitration.

(f) The determination of the arbitrator shall be required to include a reasoned basis for its decision.

(g) Unless this Agreement is terminated in accordance with the provisions of Article 21, during the pendency of any arbitration proceeding, Licensee and Licensor will fully perform the requirements of this Agreement.

**22.05  Effect of Nonarbitrable Claims.** If, after Licensor or Licensee institutes an arbitration proceeding, one or the other asserts a claim, counterclaim or defense, the subject matter of which, under statute or current judicial decision is nonarbitrable for public policy reasons, the party against whom the claim, counterclaim or defense is

asserted may elect to proceed with the arbitration of all arbitrable claims, counterclaims or defenses, or to proceed to litigate all claims, counterclaims or defenses in a court having competent jurisdiction.

**22.06** **Waiver of Punitive Damages.** Licensor and Licensee (and their respective owners and guarantors if applicable) agree to waive, to the fullest extent permitted by law, any right to, or claim for, any punitive or exemplary damages against the other and against any affiliates, owners, employees, or agents of the other and agree that in the event of a dispute, Licensor and Licensee will each be limited to the recovery of any actual damages sustained by it.

**22.07** **Choice of Forum.** Licensor and Licensee (and their respective owners and guarantors if applicable) each agree that if litigation is permitted under this Agreement, the sole forum for litigation arising under this Agreement, or any aspect of their relationship between us (even if additional parties are named as parties to that litigation) will be an appropriate state or federal court in California, and both Licensor and Licensee waive any objection they may have to either the jurisdiction or the venue of such court (except to the extent jurisdiction is preempted by the arbitration provisions of this Agreement), and each of Licensor and Licensee consent to personal jurisdiction and venue in such court. Notwithstanding the forgoing, if Licensor is permitted to seek injunctive relief under this Agreement, it may, at it option, bring that action in the county in which the Licensed Business is located.

**22.08** **Waiver of Trial by Jury.** LICENSOR AND LICENSEE EACH WAIVE THEIR RIGHT TO A TRIAL BY JURY. This waiver applies to all causes of action that are or might be included in any such action, including claims related to the enforcement or interpretation of this Agreement, allegations of state or federal statutory violations, fraud, misrepresentation or similar causes of action and it applies even if persons that are not a party to this Agreement are named as additional parties in the proceeding.

**22.09** **Waiver of Damages for Denial or Delay of Consent.** Each party hereby waives any claims, whether directly, by way of setoff, counterclaim, defense or otherwise, for money damages or otherwise, by reason of any withholding or delaying of any consent or approval by any person. The sole remedy for such claim is to submit the claim to arbitration, as described in this Agreement, and for the arbitrator to order the party to grant such consent.

**22.10** **Waiver of Collateral Estoppel.** The parties agree they should each be able to settle, mediate, litigate, arbitrate, or compromise disputes in which they are involved with third parties, without having those disputes directly affect the contract or relationship between them. Licensor and Licensee therefore each agree that a decision of an arbitrator or court of law to which either of Licensor or Licensee is not a party will not prevent the person that was a party to such action from making similar arguments, or taking similar positions, in any action between Licensor and Licensee. Licensor and Licensee therefore waive the right to assert that principles of collateral estoppel prevent either of them from raising any claim or defense in an action between them if either of them lost a similar claim or defense in another action.

## XXIII.
## INDEPENDENT CONTRACTORS/INDEMNIFICATION

**23.01** **Relationship of Licensee to Licensor.** Licensee is a licensee of Licensor. Licensee shall be conspicuously identified at the premises of the Licensed Business and in all dealings with customers and suppliers as a licensee. All written materials given to customers of the Licensed Business, including but not limited to promotional materials and inspection reports, shall clearly identify that the Licensed Business is independently owned and operated by Licensee. Licensee shall not represent or imply to any person that this Agreement authorizes Licensee to act as agent for Licensor.

**23.02** **Indemnity by Licensee.** Neither Licensor nor Licensee shall be obligated by any agreement, representation or warranty (except warranties specifically authorized by Licensor, if any) made by the other, nor shall Licensor be obligated for damages to any person or property directly or indirectly arising out of the operation of the Licensed Business or Licensee's business conducted hereunder, breach of contract, or caused by Licensee's negligence, willful action or failure to act. Licensee agrees to indemnify Licensor in any action, suit, proceeding, demand, investigation or inquiry (formal or informal) wherein the liability of Licensor is alleged or in which it is named as a party as a result of activities by Licensee which are not in accordance with this Agreement, with Licensor policy as published in any of Licensor's Manuals, or with any law, rule, regulation or

custom governing the Licensed Business. In the event that such an action or claim is made against Licensor, Licensee shall indemnify and hold harmless Licensor from all costs reasonably incurred by Licensor in the defense of any such claim brought against it, or in any such action in which it is named as a party, including without limitation, reasonable attorneys' fees, costs of investigation or proof of facts, court costs, other litigation expenses and travel and living expenses, and from all amounts paid or incurred by Licensor arising out of such claim or action. Licensor shall have the right to defend any such claim against it. Such an undertaking by Licensor shall, in no manner or form, diminish Licensee's obligation to indemnify Licensor and to hold it harmless. Licensor shall not be required or obligated to seek recovery from third parties or otherwise mitigate its losses in order to maintain a claim against Licensee. If a decision rendered in an action or suit covered by this Section 23.02 is against Licensee or Licensor, and Licensor desires to appeal the decision, Licensee may notify Licensor within ten days of the date of the decision of its intent to abide by the decision, then, in such event, Licensee shall pay Licensor the amount required of it under this Section 23.02, and all future costs related to the appeal or settlement of the claim shall be the responsibility of Licensor.

**23.03 Indemnity by Licensor.** Licensor agrees to indemnify Licensee against, and to reimburse Licensee for, any obligation or liability for damages payable to persons other than Licensee or its owners that are attributable to agreements, representations or warranties of Licensor, or caused by the negligent or willful action of Licensor, and for costs (as hereinabove defined) reasonably incurred by Licensee in the defense of any claim brought against it as a result of the foregoing or in any such action in which it is named as a party. Licensor shall have the right to participate in and to control any litigation or proceeding which might result in liability of or expense to Licensee subject to indemnification by Licensor.

**23.04 Survival of Indemnities.** The indemnities and assumption of liabilities and obligations herein shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## XXIV.
## GOVERNING LAW/BINDING EFFECT/CONSTRUCTION/WAIVER/ NOTICES

**24.01 Governing Law.** The Lanham Act (15 U.S.C. §1051 *et seq.*) governs any federal issue involving the Names and Marks. Except as otherwise provided in Article XXII of this Agreement and this section 24.01, the laws of the State of Nevada govern the terms of this Agreement and the legal relationship between Licensor and Licensee.

**24.02 Successors and Assigns.** This Agreement is binding upon the parties hereto, their respective heirs, assigns and successors in interest.

**24.03 Entire Agreement; Modification.** The introduction, recitals and exhibits hereto are a part of this Agreement, which together with the Offering Circular constitutes the entire agreement of the parties, and at the time of this Agreement, there are no other oral or written understandings or agreements between Licensor and Licensee relating to the subject matter of this Agreement. Specifically, Licensee acknowledges that it has entered into this Agreement after making an independent investigation of Licensor's operations and not upon any representation as to profits which Licensee might be expected to realize, nor has anyone made any other representation to induce Licensee to accept the License granted hereunder and to execute this Agreement which is not expressly set forth herein or in the Offering Circular Licensee acknowledges having received at least ten business days prior to the execution of this Agreement. No modification of this Agreement shall be valid unless such modification is in writing and signed by Licensee and Licensor.

**24.04 Titles for Convenience Only.** The headings of the several sections above are for convenience only and do not define, limit or construe the contents thereof. The term "Licensee" as used herein is applicable to one or more persons, a corporation or a partnership, as the case may be, and the singular usage includes the plural and the masculine and feminine usages include the other and the neuter. References to "Licensee" applicable to any individual shall mean the principal owner or owners of the equity or operating control of Licensee if Licensee is a corporation, limited liability company or partnership.

**24.05 Construction.** Licensor and Licensee agree that if any provision of this Agreement is capable of 2 constructions, one of which would render the provision illegal or otherwise voidable or unenforceable and the other of which would render the provision valid and enforceable, the provision shall have the meaning which

renders it valid and enforceable. The language of all provisions of this Agreement shall be construed simply according to its fair meaning and not strictly against Licensor or Licensee.

**24.06** <u>**Severability.**</u> It is the desire and intent of Licensor and Licensee that the provisions of this Agreement be enforced to the fullest extent possible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any provision of this Agreement is adjudicated to be invalid or unenforceable, such adjudication is to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made. All provisions of this Agreement are severable and this Agreement shall be interpreted and enforced as if all completely invalid and unenforceable provisions were not contained herein, and partially valid and enforceable provisions shall be enforced to the extent valid and enforceable. Licensor and Licensee shall substitute a valid and enforceable provision for any specification, standard, operating procedure, rule or other obligation of Licensee or Licensor that is determined to be invalid or unenforceable and is not waived by the other.

**24.07** <u>**Failure or Delay to Exercise Right is Not Waiver.**</u> Licensor and Licensee, by written instrument, may unilaterally waive any obligation of or restriction upon the other under this Agreement. No acceptance by Licensor of any payment by Licensee and no failure, refusal or neglect of Licensor or Licensee to exercise any right under this Agreement or to insist upon full compliance by the other with its obligations hereunder or with any specification, standard or operating procedure shall constitute a waiver of any provision of this Agreement or any specification, standard or operating procedure; provided, however, that such failure, refusal or neglect to exercise any right under this Agreement or to insist upon full compliance by the other with its obligations under this Agreement or under state or federal law, or with any specification, standard or operating procedure, shall constitute a waiver of any default arising under this Agreement or under state or federal law and shall preclude exercise or enforcement of any right or remedy arising there from, unless written notice of such default is provided by the non-defaulting party within 24 months after such right or default occurs (except that this 24 month clause shall not apply to any default that arises in whole or in part by the underreporting of Gross Receipts by Licensee). No exercise or enforcement by Licensor or Licensee of any right or remedy hereunder shall preclude the exercise or enforcement by Licensor or of Licensee of any other right or remedy hereunder or which Licensor or Licensee is entitled by law to enforce.

**24.08** <u>**Notices.**</u> All written notices permitted or required to be delivered by the provisions of this Agreement shall be deemed so delivered (i) when delivered by hand, (ii) five business days after placed in the mail system of the United States or Canada by registered or certified mail, return receipt requested, postage prepaid, and addressed to the party to be notified at its most current principal business address of which the notifying party has been notified, (iii) one business day after sent via overnight courier, postage prepaid, and addressed to the party to be notified at its most current principal business address of which the notifying party has been notified; or (iv) one business day after transmission by facsimile, telecopy or other electronic system, including e-mail to the principal e-mail account address of which the notifying party has been notified.

**24.09** <u>**Licensor's Right to Vary Standard Specifications and Practices.**</u> Because complete and detailed uniformity under many varying conditions may not be possible or practical, Licensor specifically reserves the right and privilege, at its sole discretion and as it may deem in the best interests of all concerned in any specific instance, to vary standards for any license owner based upon the peculiarities of a particular site or circumstance, density of population, business potential, population of trade area, existing business practices or any other condition which Licensor deems to be of importance to the successful operation of such license owner's business. Licensee shall not complain on account of any variation from standard specifications and practices granted to any other license owner and shall not be entitled to require Licensor to grant to Licensee a like or similar variation thereof.

**24.10** <u>**Franchisee's Right to More Favorable Terms.**</u> Licensor hereby agrees that the terms of the Agreement will be deemed modified automatically to conform to the most favorable terms granted to any other ACE DuraFlo licensee in the future. Furthermore, if Licensor adopts a new standard form of franchise agreement or adds additional services by addenda or otherwise, Licensee will have the right to be exercised in its sole discretion to restate this Agreement to be entirely in the form of the standard franchise agreement or to incorporate any portion thereof into this Agreement.

Exhibit A, Page 26

**24.11  Advice of Counsel.** Each party represents that before signing this Agreement, such party had the opportunity (and was strongly advised) to seek advice from an attorney of his, her or its own choosing, and that such party has read and understands all of the terms and provisions of this Agreement.

IN WITNESS WHEREOF, Licensor and Licensee have executed this Agreement the day and year first above written, effective as of the date executed by Licensor.

LICENSEE: _____          8/31/04

LICENSOR:
By: _____
Position   _____

# EXHIBIT "B"



*Better than a repipe®*
*without destroying walls.*

### Addendum to License Agreement

August 24, 2016

This addendum is to the license agreement dated August 31, 2004 with most current revisions dated February 3, 2012 between ACE DuraFlo Systems, LLC ("Licensor") and Florida Pipelining Solutions, LLC ("Licensee"), owned by Ron Coddington. This addendum hereby extends the terms set out in both agreements for a period of 10 years as of the "Effective Date", which is defined as the date on which the last party signs this Agreement.

IN WITNESS WHEREOF, the parties hereto have duly executed this Consent as of the Effective Date.

LICENSEE:
**Florida Pipelining Solutions, LLC**
By: _____
Title: _Executive VP_
Printed Name: _Randy L. Hronyak_
Date: _August 31, 2016_
PRINCIPALS:
_____
Printed Name: _Ronald W. Coddington_

_____
Printed Name:_____

LICENSOR:
**ACE DURAFLO SYSTEMS, LLC**
By: _____
Title: _CEO_
Printed Name: _Lenny Gillanders_
Date: _Aug 24, 2016_

**ACE DuraFlo Systems, LLC** • 3122 W. Alpine Street • Santa Ana, CA 92704
Toll Free: (888) 775-0220 • Office: (714) 564-7730 • Fax: (714) 564-7607
Email: info@aceduraflo.com • www.aceduraflo.com



Exhibit B, Page 28

**EXHIBIT "C"**

3/29/23, 1:23 PM    Case 8:23-cv-00237-FWS-DFM    Document 18-3    Detail by Entity Name    Filed 03/30/23    Page 33 of 45    Page ID #:202

DIVISION OF CORPORATIONS



# Detail by Entity Name

Florida Limited Liability Company
FLORIDA PIPE-LINING SOLUTIONS, LLC

## Filing Information

| | |
|---|---|
| **Document Number** | L11000085418 |
| **FEI/EIN Number** | 45-2825295 |
| **Date Filed** | 07/25/2011 |
| **Effective Date** | 07/25/2011 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | LC AMENDMENT |
| **Event Date Filed** | 08/15/2022 |
| **Event Effective Date** | NONE |

## Principal Address

210 FIELD END STREET
SARASOTA, FL 34240

Changed: 01/04/2012

## Mailing Address

210 FIELD END STREET
SARASOTA, FL 34240

Changed: 01/04/2012

## Registered Agent Name & Address

Coddington, Ronald W
210 FIELD END STREET
SARASOTA, FL 34240

Name Changed: 04/24/2014

Address Changed: 04/24/2014

## Authorized Person(s) Detail

**Name & Address**

Title PRESIDENT/GENERAL MANAGER

Exhibit C, Page 29

CODDINGTON, RONALD C
210 FIELD END STREET
SARASOTA, FL 34240

Title EXECUTIVE V.P.

STOLZ, PAMELA
210 FIELD END STREET
SARASOTA, FL 34240

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2021 | 03/31/2021 |
| 2022 | 02/03/2022 |
| 2023 | 01/30/2023 |

**Document Images**

| | |
|---|---|
| 01/30/2023 -- ANNUAL REPORT | View image in PDF format |
| 08/15/2022 -- LC Amendment | View image in PDF format |
| 02/03/2022 -- ANNUAL REPORT | View image in PDF format |
| 03/31/2021 -- ANNUAL REPORT | View image in PDF format |
| 09/17/2020 -- LC Amendment | View image in PDF format |
| 04/02/2020 -- ANNUAL REPORT | View image in PDF format |
| 03/21/2019 -- ANNUAL REPORT | View image in PDF format |
| 02/01/2018 -- ANNUAL REPORT | View image in PDF format |
| 02/16/2017 -- ANNUAL REPORT | View image in PDF format |
| 04/07/2016 -- ANNUAL REPORT | View image in PDF format |
| 03/19/2015 -- ANNUAL REPORT | View image in PDF format |
| 04/24/2014 -- ANNUAL REPORT | View image in PDF format |
| 04/15/2013 -- ANNUAL REPORT | View image in PDF format |
| 03/21/2013 -- LC Name Change | View image in PDF format |
| 01/04/2012 -- ANNUAL REPORT | View image in PDF format |
| 07/25/2011 -- Florida Limited Liability | View image in PDF format |

Florida Department of State, Division of Corporations

Exhibit C, Page 30

# EXHIBIT "D"

3/29/23, 1:28 PM   Case 8:23-cv-00237-FWS-DFM   Document 18-1   Filed 03/30/23   Page 36 of 45   Page ID
#:205
Detail by Entity Name

DIVISION OF CORPORATIONS



Department of State / Division of Corporations / Search Records / Search by Entity Name /

## Detail by Entity Name

Florida Limited Liability Company
FLORIDA DRAIN-LINING SOLUTIONS, LLC

### Filing Information

| | |
|---|---|
| **Document Number** | L22000324081 |
| **FEI/EIN Number** | 92-0376721 |
| **Date Filed** | 07/21/2022 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | LC AMENDMENT |
| **Event Date Filed** | 11/29/2022 |
| **Event Effective Date** | NONE |

### Principal Address

210 FIELD END STREET
SARASOTA, FL 34240

Changed: 03/08/2023

### Mailing Address

210 FIELD END STREET
SARASOTA, FL 34240

Changed: 03/08/2023

### Registered Agent Name & Address

CORPORATION SERVICE COMPANY
1201 HAYS STREET
TALLAHASSEE, FL 32301

Name Changed: 03/08/2023

Address Changed: 03/08/2023

### Authorized Person(s) Detail

**Name & Address**

Title MGR

Exhibit D, Page 31

CODDINGTON, RONALD W
210 FIELD END STREET
SARASOTA, FL 34240

Title Executive Vice President

Stolz, Pamela
210 FIELD END STREET
SARASOTA, FL 34240

Title MGR

STOLZ, PAMELA
210 FIELD END STREET
SARASOTA, FL 34240

### Annual Reports

| Report Year | Filed Date |
| --- | --- |
| 2023 | 02/01/2023 |

### Document Images

| | |
| --- | --- |
| 03/08/2023 -- Reg. Agent Change | View image in PDF format |
| 02/01/2023 -- ANNUAL REPORT | View image in PDF format |
| 11/29/2022 -- LC Amendment | View image in PDF format |
| 07/21/2022 -- Florida Limited Liability | View image in PDF format |

Florida Department of State, Division of Corporations

Exhibit D, Page 32

**EXHIBIT "E"**

| From: | Cecilia Liu |
|---|---|
| To: | Oines, Ronald |
| Cc: | Goldfinger, Talya; Otto Lee; Kevin Viau; Joey Law; Solórzano, Cecilia |
| Subject: | Re: Pipe Restoration Technologies LLC et al v. Florida Drain-Lining Solutions, LLC et al, Case No. 8:23-cv-00237-FWS-DFM |
| Date: | Friday, March 17, 2023 4:59:04 PM |
| Attachments: | image001.png |

Dear Ron,

After reviewing the case and talking with Mr. Coddington, we believe a motion to dismiss or to transfer venue for lack of personal jurisdiction and improper venue based on Fed. R. Civ. P. 12(b)(2) and 12(b)(3), and 28 U.S.C. § 1404(a) and § 1406(a) is warranted. Our request to extend the time to respond is made with the intent that the parties could resolve this issue and avoid potentially unnecessary motion practice.

This motion is made on the grounds that none of the Defendants have minimum contacts with the state of California.  The Defendants are an out-of-state entity and an out-of-state individual who conduct their business operations and personal lives outside of California.

Defendant FDLS is a Florida Limited Liability Company with its principal office located in Sarasota, Florida. Defendant Coddington also lives in Sarasota, Florida. Defendants have never conducted any business activities in nor have other connections with California. Defendants' customers and targeted customers are Florida-based only.

Plaintiffs provide no further details in support of its conclusory allegation that "FDLS and Coddington are subject to personal jurisdiction in this district based on their contacts and business dealings with Plaintiffs and others in this district".

The referenced license agreement which contains the choice of forum clause are agreed between Florida Pipe-Lining Solutions, LLC ("FPLS") and Plaintiff ACE to the extent of potable water pipes services only. Defendant Florida Drain-Lining Solutions, LLC ("FDLS") has never been a party, a licensee, or an assignee of the license agreement, nor FDLS's business of drain lines services has ever subjected to the license agreement.

Defendant Mr. Coddington has never been a licensee or an assignee of the license agreement. He has never agreed to the choice of forum as an individual independent from FPLS and its licensed business pursuant to the license agreement.

Therefore, the dispute resolution clauses including choice of forum agreed in the license agreement do not apply in this case. Venue in this judicial district is improper, and further, the Court lacks personal jurisdiction over Defendants.

Please let us know your availability for a call Monday to discuss the motion.

Thank you.


Sincerely,

**Cecilia Liu**

Of Counsel

 **Intellectual Property Law Group LLP**

1871 The Alameda, Suite 250
San Jose, California 95126
Tel: (408) 286-8933 Fax: (408) 286-8932
Website: www.iplg.com

*CONFIDENTIAL PRIVILEGED*
*This e-mail message is intended for the sole use of the named*
*recipient(s) and may contain confidential and privileged information.*
*Any unauthorized review, use, disclosure or distribution is prohibited.*
*If you are not the intended recipient, please immediately destroy all*
*copies of the original message and contact the sender by reply e-mail.*
*Thank You.*

On Fri, Mar 17, 2023 at 2:42 PM Cecilia Liu <cliu@iplg.com> wrote:

Hi Ron,

I called your office and left a voice message. We were contacted by FDLS's side the
weekend before FDLS's answer was originally due on March 6. We did not have a chance to
talk with Mr. Coddington until this week due to time conflicts and the time difference
between California and Florida.

We hope that you could consider another one week extension and we will provide reciprocal
cooperation in the future.

Thank you.


Sincerely,

**Cecilia Liu**

Of Counsel

 **Intellectual Property Law Group LLP**

1871 The Alameda, Suite 250
San Jose, California 95126
Tel: (408) 286-8933 Fax: (408) 286-8932
Website: www.iplg.com

*CONFIDENTIAL PRIVILEGED*
*This e-mail message is intended for the sole use of the named*
*recipient(s) and may contain confidential and privileged information.*
*Any unauthorized review, use, disclosure or distribution is prohibited.*
*If you are not the intended recipient, please immediately destroy all*
*copies of the original message and contact the sender by reply e-mail.*
*Thank You.*


On Fri, Mar 17, 2023 at 2:31 PM Oines, Ronald <roines@rutan.com> wrote:

Exhibit E, Page 34

Hi Cecilia:

I spoke with my client. We are concerned that Defendants are simply dragging their feet. My clients have been in communication with defendants about some of the trademark and other issues about which my clients are concerned, but defendants are being unresponsive. Defendants were served with and have been aware of the lawsuit for more than a month, but appear to be essentially ignoring it. You have not provided any reason for requesting another extension.  We think it is in the parties' best interest to move this case along expeditiously. Therefore, we are not inclined to grant another extension, particularly because you have not even stated why you need another extension.

Ron

**Ronald P. Oines**

18575 Jamboree Road, 9th Floor | Irvine, CA 92612
O. (714) 641-5100 | D. (714) 662-4680
roines@rutan.com | www.rutan.com



_____
Privileged And Confidential Communication.
This electronic transmission, and any documents attached hereto, (a) are protected by the Electronic Communications Privacy Act (18 USC §§ 2510-2521), (b) may contain confidential and/or legally privileged information, and (c) are for the sole use of the intended recipient named above. If you have received this electronic message in error, please notify the sender and delete the electronic message. Any disclosure, copying, distribution, or use of the contents of the information received in error is strictly prohibited.

**From:** Cecilia Liu <cliu@iplg.com>
**Sent:** Friday, March 17, 2023 11:09 AM
**To:** Oines, Ronald <roines@rutan.com>
**Cc:** Goldfinger, Talya <tgoldfinger@rutan.com>; Otto Lee <olee@iplg.com>; Kevin Viau <kviau@iplg.com>; Joey Law <jlaw@iplg.com>; Solórzano, Cecilia <CSolorzano@rutan.com>
**Subject:** Re: Pipe Restoration Technologies LLC et al v. Florida Drain-Lining Solutions, LLC et al, Case No. 8:23-cv-00237-FWS-DFM

Dear Ron,

Kindly let us know if we can have one more week extension for both defendants given there has been no extension yet for Mr. Coddington whose response to the complaint is originally due Mar 20. We'll send you a stipulation accordingly.

Thank you.

Sincerely,

**Cecilia Liu**

Of Counsel

**Intellectual Property Law Group LLP**

1871 The Alameda, Suite 250
San Jose, California 95126
Tel: (408) 286-8933 Fax: (408) 286-8932
Website: www.iplg.com

*CONFIDENTIAL PRIVILEGED*
*This e-mail message is intended for the sole use of the named*
*recipient(s) and may contain confidential and privileged information.*
*Any unauthorized review, use, disclosure or distribution is prohibited.*
*If you are not the intended recipient, please immediately destroy all*
*copies of the original message and contact the sender by reply e-mail.*
*Thank You.*

On Mon, Mar 6, 2023 at 12:55 PM Cecilia Liu <cliu@iplg.com> wrote:

> Thank you, Ron.
>
> Sincerely,
>
> **Cecilia Liu**
>
> Of Counsel
>
> **Intellectual Property Law Group LLP**
>
> 1871 The Alameda, Suite 250
> San Jose, California 95126
> Tel: (408) 286-8933 Fax: (408) 286-8932

Website: www.iplg.com

*CONFIDENTIAL PRIVILEGED*
*This e-mail message is intended for the sole use of the named*
*recipient(s) and may contain confidential and privileged information.*
*Any unauthorized review, use, disclosure or distribution is prohibited.*
*If you are not the intended recipient, please immediately destroy all*
*copies of the original message and contact the sender by reply e-mail.*
*Thank You.*

On Mon, Mar 6, 2023 at 12:43 PM Oines, Ronald <roines@rutan.com> wrote:

You may file with my e-signature.

Thanks

Ron

---

**From:** Cecilia Liu <cliu@iplg.com>
**Sent:** Monday, March 6, 2023 12:02 PM
**To:** Oines, Ronald <roines@rutan.com>
**Cc:** Goldfinger, Talya <tgoldfinger@rutan.com>; Otto Lee <olee@iplg.com>; Kevin Viau <kviau@iplg.com>; Joey Law <jlaw@iplg.com>
**Subject:** Re: Pipe Restoration Technologies LLC et al v. Florida Drain-Lining Solutions, LLC et al, Case No. 8:23-cv-00237-FWS-DFM

Hi Ronald,

Thank you for the consent to a 2-week extension. Please see the attached draft stipulation and proposed order. Kindly let us know if we have your authorization to file the stipulation with your e-signature.

Thank you.

Sincerely,

**Cecilia Liu**

Of Counsel



**Intellectual Property Law Group LLP**

1871 The Alameda, Suite 250
San Jose, California 95126
Tel: (408) 286-8933 Fax: (408) 286-8932
Website: www.iplg.com

*CONFIDENTIAL PRIVILEGED*
*This e-mail message is intended for the sole use of the named*
*recipient(s) and may contain confidential and privileged information.*
*Any unauthorized review, use, disclosure or distribution is prohibited.*
*If you are not the intended recipient, please immediately destroy all*
*copies of the original message and contact the sender by reply e-mail.*
*Thank You.*

On Mon, Mar 6, 2023 at 7:26 AM Oines, Ronald <roines@rutan.com> wrote:

Hi Cecelia,

One month seems excessive. We would agree to March 20 for both defendants.

Ron

**Ronald P. Oines**

18575 Jamboree Road, 9th Floor | Irvine, CA 92612
O. (714) 641-5100 | D. (714) 662-4680
roines@rutan.com | www.rutan.com



Privileged And Confidential Communication.
This electronic transmission, and any documents attached hereto, (a) are protected by the Electronic Communications Privacy Act (18 USC §§ 2510-2521), (b) may contain confidential and/or legally privileged information, and (c) are for the sole use of the intended recipient named above. If you have received this electronic message in error, please notify the sender and delete the electronic message. Any disclosure, copying, distribution, or use of the contents of the information received in error is strictly prohibited.

**From:** Cecilia Liu <cliu@iplg.com>
**Sent:** Saturday, March 4, 2023 8:00 AM
**To:** Oines, Ronald <roines@rutan.com>
**Cc:** Goldfinger, Talya <tgoldfinger@rutan.com>; Otto Lee <olee@iplg.com>; Kevin Viau <kviau@iplg.com>; Joey Law <jlaw@iplg.com>
**Subject:** Pipe Restoration Technologies LLC et al v. Florida Drain-Lining Solutions, LLC et al, Case No. 8:23-cv-00237-FWS-DFM

Dear Ronald,

This law firm has just been retained by Florida Drain-Lining Solutions, LLC and Mr. Ronald Coddington in relation to the referenced lawsuit. Please direct all future correspondence regarding this matter to us.

We're still reviewing the complaint and relevant documents. A response to the complaint is currently due Monday, March 6, 2023. Considering we're very recently retained, kindly let us know if you will agree to a one-month extension of time until April 6 to respond to the complaint. If so, we will prepare a stipulation for your review.

Thank you and look forward to hearing from you.

Sincerely,

**Cecilia Liu**

Of Counsel



**Intellectual Property Law Group LLP**

1871 The Alameda, Suite 250
San Jose, California 95126
Tel: (408) 286-8933 Fax: (408) 286-8932
Website: www.iplg.com

*CONFIDENTIAL PRIVILEGED*
*This e-mail message is intended for the sole use of the named*
*recipient(s) and may contain confidential and privileged information.*
*Any unauthorized review, use, disclosure or distribution is prohibited.*
*If you are not the intended recipient, please immediately destroy all*
*copies of the original message and contact the sender by reply e-mail.*
*Thank You.*